OPINION OF THE COURT
Fuchsberg, J.
We have heretofore held that prior inconsistent statements, though secured in disregard of constitutional safeguards, nevertheless may be admitted to impeach the credibility of a defendant who chooses to take the stand to testify in contradiction of the contents of the flawed statements (People v Washington, 51 NY2d 214, 220; People v Wise, 46 NY2d 321, 329; People v Kulis, 18 NY2d 318 [denial of arrestee’s request to see a lawyer]; see Harris v New York, 401 US 222; see US Const, 5th, 6th, 14th Arndts; NY Const, art 1, § 6). We now hold that, without more, such statements may not be used, directly or indirectly, to establish the People’s case. Because this standard was not followed, there must be a new trial.
The issue confronts us in the context of defendant Anthony Ricco’s appeal from an order of the Appellate Division, which affirmed a judgment entered on a jury verdict pronouncing him guilty of two counts of murder and four counts of robbery, all stemming from a string of “stickups” in which the then 21-year-old defendant engaged during an eventful week in February, 1975. The statements in question were made in the course of two interrogations conducted by a New York City detective, Eugene Grogan. On each occasion, the questioning proceeded in the absence of counsel despite the fact that Ricco already had been arrested and then identified at a lineup at which a lawyer *324 had appeared on his behalf.[1] Of particular interest on this appeal is the fact that Grogan later was to testify that, in these conversations, the defendant implicated a friend, Ralph C err ato, in the commission of the crimes. According to the detective, this Ricco did, while interspersing his conversation with a statement that he was “hearing voices”, by volunteering, among other things, that it was this friend who had provided him with a gun and had engineered the at-gunpoint seizure of a Chevrolet Corvette used in their marauding adventures, by furnishing Cerrato’s description and by offering to help the officer find him.
The defense essentially was one of insanity (Penal Law, § 30.05). In its support, at the trial Ricco and his mother took the stand to help describe a life which from early childhood had been beset, among other things, by early paternal loss, serious physical and mental malaise, the loss of an eye, clashes with the law, imprisonment, psychiatric hospital treatment, learning difficulties, constant dependence on medication and, most pointedly, delusions. The most bizarre of the latter was defendant’s alleged persistent belief that microwaves emitted from orbiting space vehicles which bore the monogram of Howard Hughes, the eccentric billionaire businessman, exercised so direful a control over behavior of those on earth that, for instance, Ricco had urgently tried to protect his young daughter from this force by attempting to have a plutonium plate implanted in her head.
As applied to one of the killings of which he stands convicted, that of a hotel clerk, Ricco’s testimonial description of the delusional experience to which he ascribes it is graphic. In his words, shortly after experiencing a headache, pains in his eyes, blurred vision and dizziness, he and the clerk “got into an argument”, at which time Ricco heard a ringing in his ears, saw the clerk’s “aura” and “noticed the flicks in his eyes” and then “[t]old him, I says, I want to know if the people that come here are under the influence of the machine. He looked at me. He got mad. He *325 says, get out of here. I’m going to kill you. He was shaking a pencil at me. * * * Alonzo [one of Ricco’s cohorts] was talking to Ralphie. * * * He had a gun in his left hand”. Ricco then goes on to relate how he grabbed the gun by the cylinder and the clerk told him to leave, whereupon Ricco responded, “Leave what? I said: Why should I leave? * * * I wanted to know if the people that were there had any information about the machine”. To this he adds that there was an ensuing scuffle, during which the gun went off twice, whereupon “[the clerk] stopped. His whole body just disappeared. * * * I don’t know what happened. I was, you know, concerned with what was going on between me and the robot. * * * The ringing in my ears got louder, his aura started changing. I was watching his aura. It started getting redder. * * * I wasn’t paying attention. I was watching the body change its color. The aura stopped. The ringing in my ears stopped”.
It was against all this background that six of seven qualified psychiatrists called by the defense expressed the opinion that Ricco was not criminally responsible for his actions. For its part, the prosecution apparently was intent on establishing that defendant’s claim that he was obsessed with the delusions on which his psychiatric experts relied was feigned. Its theory was that the acts with whose commission the defendant was charged, if compelled by genuine aberrations of the kind with which his mind was allegedly preoccupied, would be expected to be accompanied by a sense of righteousness and self-justification completely at odds with the defendant’s attempt to heap blame on another.
However, because, as we only recently reaffirmed, “ ‘[o]nce an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant’s right to counsel’” (People v White, 56 NY2d 110, 117, quoting People v Arthur, 22 NY2d 325, 329; see People v Hobson, 39 NY2d 479), the exclusionary rule precluded the People from offering Ricco’s statements regarding the Cerrato connection as evidence-in-chief on the People’s own case.
*326 But this did not mean that the statement could not serve other evidentiary purposes. As indicated at the outset of this opinion, once the defendant elected to testify, the People could, and indeed here did, resort to it on cross-examination in an effort to impeach his credibility. To paraphrase Oregon v Hass (420 US 714, 722), “[a] shield provided by [failure to respect the right to counsel] is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances”. As it turned out, the confrontational questions put for this purpose, framed as they were in terms of whether the defendant “remembered” the conversation, drew no more than the noncommittal answer, “I do not believe so”.
 On the same rationale, it also was proper for the prosecution to then call Detective Grogan on rebuttal. Needless to say, as with all evidence introduced restrictively, the jury should have been so advised. Here no limiting instructions were requested and none were deliv3red, the only objection voiced being that it went beyond the material delivered to the defendant pursuant to People v Rosario (9 NY2d 286, 289). Nevertheless, though this abjection did not focus on the deprivation of the right to counsel, the effect of the trial court’s ruling was to foreclose further protest, including any request for limiting instructions. Accordingly, the People’s contention that the issue was not preserved is unavailing (cf. People v Carmine A., 53 NY2d 816; People v Samuels, 49 NY2d 218; People v Ermo, 47 NY2d 863).
Finally, on rebuttal, the People’s psychiatric expert, in response to the prosecutor’s hypothetical question, in which was incorporated the uncounseled statements from Ricco to Grogan anent Cerrato’s participation, opined that, with “reasonable medical certainty, these are not the statements that would have been consistent with the alleged delusions that Mr. Ricco later presented * * * about the space-ship, Howard Hughes, etc., etc., that this is the information he would have been eager to communicate to the detective; that on the contrary, what I’m told happened here was information in which he tried to place the responsibility elsewhere, rather than proudly taking it upon *327 himself for having tried to save this country and the world from this tremendous nemesis”. On this basis, he stated a firm conclusion that the defendant was “consciously and intentionally simulating mental illness”.
Surely, this testimony went far beyond impeachment. As proof of malingering, it was employed to overcome the defendant’s claim of insanity, an issue on which the People bore the burden of proof beyond a reasonable doubt (Penal Law, § 25.00, subd 1; § 30.05, subd 2). Thus, it was no less a part of the People’s case than was the charged criminal conduct per se.
Yet, the Cerrato component, whose essentiality in providing the foundation for this vital expert testimony is so expressly acknowledged, only came in through the detective and then properly for impeachment alone. For the psychiatrist had no independent knowledge of the utterance of the statements. His opinion, therefore, was inad-, missible.
Nor does the People’s fallback position alter this result. Noting that a defendant who raises a defense of insanity waives the privilege against self incrimination for statements to an examining psychiatrist which enable the latter to arrive at a medical opinion on the question of sanity (Matter of Lee v County Ct. of Erie County, 27 NY2d 432, 441; see CPL 60.55), the District Attorney argues for extension of this waiver to the statements made to the detective since they too were used solely on the issue of sanity. We are not persuaded. Rather, our view on this subject is consonant with that of the United States Court of Appeals for the District of Columbia Circuit that “[w]ere we to curtail the exclusionary rule in the drastic manner the government urges, we would provide little or no deterrence of constitutional violations against defendants whose sanity is the principal issue in the case. The government would be able, under the guise of rebuttal, to use any illegally obtained evidence relevant to the principal issue in the case — insanity” (United States v Hinckley, 672 F2d 115, 134).[2]
*328 Lastly, since there is to be a new trial, we indicate our disagreement with the trial court’s refusal to allow defendant’s mother to testify to statements defendant would make to her during his childhood after viewing airplanes and birds with a telescope from the roof of a tenement house in which they resided. The testimony as to his activities was allowed, but his statements were excluded as hearsay. The excluded matter was proffered both to counter any prosecution position that defendant had never described his delusions to anyone prior to his arrest and to establish that his delusional tendencies were of long standing.
The question to which objection was sustained was simply, “[D]id he have — make any statements or remarks in reference to what he saw with the telescope?” The answer to this query would not have been hearsay since it was not offered for the truth of the matter asserted in defendant’s statements (6 Wigmore, Evidence [Chadbourn rev], § 1766). On the contrary, as correctly noted by defendant, not without some degree of understatement, “[i]t was obviously not the contention of the defense that space ships were controlling behavior on earth with mysterious rays. The purpose was to show that as a young boy [defendant] was already suffering from delusional thinking.”
Moreover, whether it is not catalogued as hearsay at all or termed an “apparent exception” to the hearsay rule (see Richardson, Evidence [10th ed], § 205), a relevant extrajudicial statement introduced for the fact that it was made rather than for its contents, as here for the purpose of a proving its maker’s state of mind, is not interdicted by the hearsay rule (see, e.g., Matter of Bergstein v Board of Educ., 34 NY2d 318).
Accordingly, the order should be reversed and a new trial ordered.

. It is undisputed that on the first of these occasions the defendant, though in custody, also did not receive the warnings mandated by Miranda v Arizona (384 US 436). However, since we reverse on the right to counsel issue, we do not dwell on the analogous Miranda point in this opinion.

. The dissenting opinion’s suggestion to the contrary notwithstanding, the Hinckley court did not “limit” the application of this flat statement. Fairly read, its text merely
*328 noted that the sophistication of the police in its case emphasized the need for the rule we and the Hinckley court both bespeak.