STATE of Missouri,
Plaintiff-Respondent,

v.

Mark Anthony THOMAS,
Defendant-Appellant.

No. 13587.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 27, 1985.

Motion for Rehearing and to Transfer
Denied Oct. 16, 1985.

Application to Transfer Denied
Nov. 21, 1985.

Michael Radosevich, Kathleen Murphy Markie, Columbia, for defendant-appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

MAUS, Judge.

The appellant was found guilty of felony murder during an attempt to perpetrate a robbery when he was 16 years old. § 565.-003, RSMo 1978 (now repealed). Accordingly, he was sentenced to imprisonment for life. § 565.008.2, RSMo 1978 (now repealed). By his two points on appeal, he does not question the sufficiency of the evidence to sustain his conviction. The following is a brief outline of the facts established by viewing the evidence in favor of the state as warranted by the verdict. *State v. Ridinger*, 589 S.W.2d 110 (Mo.App. 1979).

The appellant and his girl friend, Tracy Wallace, wanted to leave Springfield. He wanted to go to South Bend, Indiana, where he formerly lived. He had a child living there. She wanted to go to Chicago where her father lived. They discussed their desires. To carry them out, they decided to rob the Thomas Halberts. The Halberts lived in the same neighborhood in Springfield where the appellant lived with his mother and where Tracy lived with her aunt and grandmother.

On the afternoon of October 20, 1982, they got two handguns from the closet in Tracy's grandmother's bedroom. The appellant test fired each gun. He hid the guns in a building behind his house. At about 7:00 p.m., appellant went to Tracy's. Tracy's aunt and grandmother left to go to church and a jewelry party. The appellant and Tracy left Tracy's house with stocking caps and Halloween masks. They went to appellant's house. There, appellant and his mother argued. Appellant left with suitcases, which he hid in bushes. Appellant and Tracy then got the guns. Tracy placed a gun in the pocket of her red wind breaker. They went to the Halbert home through the backyard, where they dropped the masks. They went to the front door of the Halbert house. As planned, Tracy knocked on the door and asked Mr. Halbert to use the telephone. Then, as she related, "He let me in to use the phone and Mark jumped from around the door." Mr. Halbert grabbed Mark around the throat and started choking him. The appellant had a gun in his hand. It fired, striking Mr. Halbert in the chest. The bullet traversed, or perforated, the heart. Mr. Halbert

pushed Tracy out and shut the door. Mr. Halbert died shortly thereafter. A shoe print in the Halbert backyard was identified as having been made by the defendant's tennis shoe. The pattern print of a tennis shoe in the dust on the front porch was consistent with the pattern of defendant's tennis shoe. The examiner did not find sufficient wear characteristics to make a positive identification of that print. The gun, established by ballistics to have killed Mr. Halbert, was later found in the closet from which it had been removed.

Mrs. Halbert testified that on the evening in question she and her husband were in the living room watching the World Series on television. She was lying on the couch and Mr. Halbert was sitting in a chair. At about 8:30 p.m., they heard a knock. Mr. Halbert opened the door. Mrs. Halbert saw a black lady step into the house. She was wearing a dark skirt and a red jacket. Mrs. Halbert also saw hands around the door. The hands were black also, large, like those of a man. She heard a pop and "that was it."

Several days later, the appellant went to South Bend, Indiana, and Tracy went to Chicago. At the behest of her grandmother, Tracy returned to Springfield about October 31, 1982. She was placed under arrest for the homicide. As a result of an agreement, she testified on behalf of the state.

After the arrest of Tracy, an order was issued for the appellant to be taken into custody. He had been arrested in South Bend, Indiana, on an unrelated burglary charge. Proceedings for his return to Greene County, apparently under the interstate compact on juveniles, were completed. On December 7, 1982, Police Detective Stokes and Deputy Juvenile Officer Epperly arrived in South Bend for the purpose of returning the appellant to Greene County. While in South Bend, the detective took a recorded statement from the defendant in the presence of the deputy juvenile officer and the defendant's mother. At his trial as an adult for felony murder, a portion of

this statement was used to impeach the defendant.

The defendant's first point is based upon this use of the statement by the state. The defendant offered an alibi for his activities in the late afternoon of the day of the homicide. He attempted to explain his shoe print by saying he played ball on the lot south of the Halbert's home. In his direct testimony, the defendant categorically denied that he shot Thomas Halbert.

On cross-examination, Thomas said that on the evening in question at 8:30 p.m., the approximate time of the homicide, he was at home. Then, upon further cross-examination, the defendant testified that he did recall making the statement to Detective Stokes. He recalled the following questions and answers:

Q. (By Mr. Monroe) And do you recall Detective Stokes asking you or saying to you in the conversation: Let's get back to the night Mr. Halbert got killed. Tell me who you were with, you know, in your own words where you were at and what you were doing?

A. Yes, I do.

Q. And do you remember answering: All right. Well, she had—"she" referring to your mother?—

MR. SANDERS: I object. Read the statement, Your Honor.

THE COURT: Overruled. Go ahead.

Q. (By Mr. Monroe)—had took my suitcase after we got into an argument, and I took the rest of my clothes and laid them on the side of the house. She kept saying: Well, you're not going to get too far because I'll call somebody and tell them not to let you on the bus or something. So I was headed down Chestnut. Tracy was walking with me. I said: Come on. Walk with me down here. I said: I'm going to see who she calls, just like that, and see what she's going to do. So I headed down Chestnut.

And then Stokes said: Which way were you going on Chestnut? And you said: Toward the bus station, out that way. I was going down that way,

Tracy and I, and then all of a sudden, I said: Hey, forget it, just like that. Let's go back to the house. And we went back to the house, was sitting down, and all of a sudden, the ambulance was down the street. People from across the street—a guy asked me: Hey, what's happening? I said: Hey, man, I'm asking you that. We went down there together, you know. I went down there after the Sterlings. You might tell them they lived across the street. I went down the street after them, you know. Do you remember you saying that?

A. Yes, I do.

Prior to trial, the defendant filed a motion to suppress this statement. In conclusory language he alleged nine reasons why the statement should be suppressed and not used as a part of the state's case in chief or for impeachment. A lengthy suppression hearing was held and the parties submitted written suggestions. Later, by docket entry, the trial court ruled, "Motion to Suppress Statements of Deft sustained, subject, however, to State being permitted to reopen the issue to counter defense case or in rebuttal."

When the state proposed to use the statement at the trial for impeachment, the defendant objected upon the bases in his motion. The state contended the statement could be properly used for impeachment, the prosecutor adding, "I'm relying specifically on *State v. Sager*, 600 S.W.2d 541 [ (Mo.App.1980) ]." The trial court then acknowledged his prior docket entry and held that under the circumstances the statement was properly admissible for the purpose of impeachment.

In view of the allegations of defendant's motion, the suggestions of the parties, and the state's expressed reliance upon *State v. Sager*, 600 S.W.2d 541 (Mo.App.1980), cert. denied, 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981), the trial court's conclusion the statement was voluntary might be found from the docket entry and ruling upon cross-examination of the defendant. Cf. *State v. Royal*, 610 S.W.2d 946 (Mo.

banc 1981); *State v. O'Toole*, 619 S.W.2d 804 (Mo.App.1981); *State v. Garrett*, 595 S.W.2d 422 (Mo.App.1980); *State v. Miller*, 593 S.W.2d 895 (Mo.App.1980).

However, to better consider the defendant's contentions, this court by order remanded the case for the trial court to make express findings on issues pertaining to admissibility of that statement, in accordance with the procedure outlined in *United States v. Johnson*, 529 F.2d 581 (8th Cir. 1976), cert. denied, 429 U.S. 909, 96 S.Ct. 2233, 48 L.Ed.2d 835 (1976) and *State v. Flenoid*, 642 S.W.2d 631 (Mo. banc 1982). The trial court, by the judge who conducted the suppression hearing and trial, made those findings and has certified the same to this court by its order. The appellant has filed suggestions in response to those findings. The findings so certified and the suggestions of the appellant have been considered in this decision.

The defendant in his brief first argues the statement was taken in violation of § 211.271, RSMo 1978. He emphasizes the following portion of that Section: "[A]ll ... statements by the child to the juvenile officer ... are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, other than proceedings under this chapter." § 211.-271.3.

In his suggestions he also makes a general assertion the statement was not voluntary. To support this assertion, he draws an adverse inference from the presence of the deputy juvenile officer. He also intimates it was improper for the deputy juvenile officer to be accompanied by the detective. Further, he is critical of the officer for inviting the participation of the appellant's mother. In summary, he says the complaint was involuntary because the appellant was questioned "under circumstances orchestrated by the juvenile officer to produce a statement which could be used against him in a criminal trial." His charge is a condemnation of the deputy juvenile officer for observing the myriad of safeguards established for the benefit of

juveniles. His complaint is tantamount to a claim that a juvenile should never be questioned relative to a criminal offense.

■ The record demonstrates the "rights" of the defendant as a juvenile were scrupulously honored. He gave the statement with the advice of and in the presence of his mother, "an adult friend" as required by *In re K.W.B.*, 500 S.W.2d 275 (Mo.App.1973). Also see *State v. Tolliver*, 561 S.W.2d 407 (Mo.App.1977). As determined by the trial court and established by the record, the juvenile officer carefully advised the defendant of his rights delineated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Also see *State v. Larson*, 623 S.W.2d 69 (Mo.App.1981). As determined by the trial court and established by the record, he was advised that any statement he gave could be used against him in the event he was prosecuted as an adult. Rule 122.05. Cf. *State v. Simon*, 680 S.W.2d 346 (Mo.App.1984). He was expressly advised that in taking the statement, Detective Stokes would not be his friend, but his adversary. See *State v. Pike*, 516 S.W.2d 505 (Mo.App.1974). Deputy Juvenile Officer Epperly in no way interrogated the appellant, the action that would be condemned by § 211.271. See *State v. Wright*, 515 S.W.2d 421 (Mo. banc 1974); *State v. Tolliver*, supra. Certainly, measured by "the totality of the circumstances standard" re-enunciated in *In Interest of A.D.R.*, 603 S.W.2d 575 (Mo. banc 1980), the defendant's first argument has no foundation in fact.

■ It is, of course, required that to be used in chief or for impeachment, a statement must have been voluntary. *State v. Sager*, supra. The ultimate test of voluntariness is whether or not the statement was the product of the defendant's free will. *State v. Craig*, 642 S.W.2d 98 (Mo. banc 1982). That determination is to be made upon an evaluation of all of the circumstances under which the statement was given. *State v. Flowers*, 592 S.W.2d 167 (Mo. banc 1979). Many of the factors to be considered are categorized in *State v. Craig*, supra, and *State v. Johnson*, 603 S.W.2d 683 (Mo.App.1980). Upon remand the trial court expressly found: "From an evaluation of the totality of the circumstances, the Court finds that said statement was the product of defendant's free will and was especially not the product of ignorance of rights or of adolescent fantasy, fright or despair." The record demonstrates the statement was freely given. It demonstrates the absence of coercion or inducement. Paraphrasing Judge Gunn, it appears the statement was intended by the defendant as a palliation by way of explanation for a macabre evening. *State v. Johnson*, supra. There was abundant evidence to support the trial court's determination the defendant's statement was voluntary. *State v. Battle*, 661 S.W.2d 487 (Mo. banc 1983); *State v. Brockman*, 634 S.W.2d 575 (Mo.App.1982).

■ The defendant also argues the statement should have been suppressed for all purposes because it was taken in contravention to his right to counsel under the Fifth and Sixth Amendments to the Constitution of the United States. He fails to cite Rule 111.10 or *State v. White*, 494 S.W.2d 687 (Mo.App.1973). The defendant's initial premise for this argument is that he was represented by counsel when the statement was taken. Contrary to this premise, the trial court found the defendant was not represented by counsel at that time. As stated, the defendant had been arrested in South Bend on an unrelated charge of burglary. Counsel had been appointed to represent him on the burglary charge. The same lawyer had been appointed to represent him in the proceedings for his return to Greene County as a juvenile in connection with the homicide. The extradition proceedings had terminated before the statement was taken. Nevertheless, from a stipulation he argues the attorney in South Bend "had been appointed to represent appellant's interests as to the extradition proceedings filed by Greene County, Missouri, *in connection with the pending Missouri murder charge* as well as an unrelated burglary offense." (emphasis by

appellant). The appellant demonstrates the fallacy of his argument by misplacing the emphasis. *As to the extradition proceedings* is the correct emphasis. As stated, that proceeding had terminated. The fact the defendant had counsel on an unrelated charge is of no significance. Cf. *Toliver v. Wyrick,* 469 F.Supp. 583 (W.D.Mo.1979); *State v. Buckles,* 636 S.W.2d 914 (Mo. banc 1982). The determination of the trial court that the defendant had no counsel when the statement was taken is supported by the record.

When the interview opened, the conversation between the defendant and Deputy Juvenile Officer Epperly included the following:

> THOMAS: Yes, I'm willing to talk to him [Stokes], but as I said before, you know, if I feel there's something that I don't want to answer, you know, I'll just let him know.
>
> EPPERLY: Okay. Now, is that agreeable with you, Mrs. Wheller?
>
> WHELLER: Yes.
>
> EPPERLY: Okay. Now, Mark, I will no longer participate in the questioning. All questions now will be handled by Detective Stokes.
>
> THOMAS: Okay.
>
> STOKES: You are Mark Thomas, right?
>
> THOMAS: Yes sir.
>
> STOKES: Okay. Mark, earlier when we first started talking to you awhile ago you said that there was a couple of things that you wanted to say.
>
> THOMAS: Yeah, well, what I wanted to point out was, what I understand is this right quick. Right now what I understand is, all right, I go back to Missouri, right?
>
> STOKES: Right.
>
> THOMAS: And I get down there and they get me a public defender or whatever …
>
> STOKES: A Public Defender, he's a lawyer.
>
> THOMAS: Or whatever. A private one.
>
> STOKES: No, he's not private. He's a lawyer.

> THOMAS: I'm talking about will either I get my own or something like that.
>
> STOKES: Yeah.

Giving the defendant the benefit of a possible ambiguity, the trial court construed the remarks of the defendant to be an implied request for counsel within the ambit of *Miranda.* The trial court then found that after such implied request, further inquiry by Detective Stokes was not initiated by the defendant as required by *Miranda* and *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). For this reason, the trial court concluded the statement was not admissible as a part of the state's case in chief.

The principles of *Miranda* require, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda v. Arizona,* 384 U.S. at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 723. Or, stated another way, "an accused, … having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* supra, 451 U.S. at 484–485, 101 S.Ct. at 1885, 68 L.Ed.2d at 386.

This court does not find from the transcript of the interview the defendant stated "that he wants an attorney" or expressed "his desire to deal with the police only through counsel." A reference to a future time when a lawyer will be available or appointed does not negate an expressed willingness to presently talk to the police without the presence of a lawyer. The comments of the defendant quoted above make reference to a future appointment, not a present desire or an unwillingness to talk without counsel. *State v. Boggs,* 634 S.W.2d 447 (Mo. banc 1982); *State v. Clark,* 552 S.W.2d 256 (Mo.App.1977).

In *Smith v. Illinois,* 469 U.S. ——, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), defendant unequivocally said he would like to have a lawyer. Nevertheless, the officers contin-

ued to question him. Concerning consideration of a subsequent statement perhaps indicating a willingness to talk without a lawyer it was declared:

> We do not decide the circumstances in which an accused's request for counsel may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself, nor do we decide the consequences of such ambiguity or equivocation. We hold only that, under the clear logical force of settled precedent, an accused's *post-request* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver.

*Smith v. Illinois,* supra, 469 U.S. at ——, 105 S.Ct. at 495, 83 L.Ed.2d at 496.

■ However, the remarks of Thomas should not, within the doctrine of that case, be said to constitute a request of sufficient clarity to bar consideration of his subsequent statement demonstrating his intent. A short time after he started his statement, the defendant declared, "Well, I did see something and I did hear something, but I'm going to save that for when I get my lawyer...." This declaration obviously demonstrates the defendant did not request a lawyer when he gave the statement. However, in view of the limited use made of the statement, this aspect of the case need not be further discussed.

■ Assuming the statement was given contrary to the restrictions of *Miranda,* it was properly used for impeachment. It has been held that a statement given without the *Miranda* warnings may be used in cross-examination if otherwise voluntary and the defendant's direct testimony is inconsistent. *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). In *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), this doctrine was held applicable where a statement was made after the warning was given but before the defendant was provided with a requested lawyer. In the latter case, it

was declared that the "shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances." *Oregon v. Hass,* supra, 420 U.S. at 722, 95 S.Ct. at 1221, 43 L.Ed.2d at 577–578.

More fraught with inherent questions of law is the defendant's claim the statement could not be used because it was taken in violation of his right to counsel under the Sixth Amendment. This claim is premised upon the assertion that at the time the statement was taken, the defendant's right to counsel under that amendment had attached. He cites a case which stands for the general proposition that in criminal prosecutions that right attaches upon the initiation of adversary judicial proceedings "by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411, 417 (1972).

While not directly shown by the record, it is a fair inference that a petition had been filed in the Juvenile Division of the Circuit Court of Greene County alleging the defendant had committed the homicide. See § 210.610.2, RSMo Supp. 1984. This inference forms a basis for this claim of error by the defendant.

■ For the reason hereafter stated, it is not necessary to consider whether, when a case has proceeded no further than extradition, the filing of such a petition could be considered equivalent to the filing of a complaint for the issuance of a warrant. The latter does not result in the attachment of such right of counsel. *State v. Beck,* 687 S.W.2d 155 (Mo. banc 1985). Cf. *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). Nor is it necessary to consider whether or not at this stage the proceeding in the juvenile court is a "criminal prosecution" as those terms are used in the Sixth Amendment. Cf. *Kirby v. Illinois,* supra; *Re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

This claim of the defendant is also predicated upon the proposition the defendant did not validly waive his right to counsel. It is generally acknowledged there may be subtle distinctions in what may constitute an effective waiver of counsel under the Fifth Amendment as opposed to the waiver of counsel under the Sixth Amendment. *Fields v. Wyrick,* 706 F.2d 879 (8th Cir. 1983), cert. denied, 464 U.S. 1020, 104 S. Ct. 556, 78 L.Ed.2d 728 (1983). Again, because of the limited use made of the statement, this court need not decide if the defendant effectively waived such right under both the Fifth and Sixth Amendments. Nor need it be determined if Rule 116.01(h), effective August 1, 1976, causes such a waiver to be impossible. Cf. *State v. Stevens,* 467 S.W.2d 10 (Mo.1971).

■ Irrespective of the resolution of the issues discussed above, no error was committed in permitting the prosecutor's reference to the defendant's statement since it was used for impeachment. As stated, a statement taken in violation of the Fifth Amendment may be used for impeachment. *Oregon v. Hass,* supra; *Harris v. New York,* supra. It is also established that evidence seized in violation of the Fourth Amendment may be used for impeachment. *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). This principle has been applied when the defendant has invoked his right to counsel. *Oregon v. Hass,* supra; *State v. Sager,* supra. This court perceives no reason why that principle is not applicable even if the defendant's statement was taken in violation of the Sixth Amendment. Other courts have so held. See, *United States v. McManaman,* 606 F.2d 919 (10th Cir.1979); *People v. Bacino,* 41 Ill.App.3d 738, 354 N.E.2d 641 (1976); *People v. Gonyea,* 126 Mich.App. 177, 337 N.W.2d 325 (1983); *People v. Ricco,* 452 N.Y.S.2d 340, 56 N.Y.2d 320, 437 N.E.2d 1097 (1982). To hold otherwise would, contrary to the principle announced in those cases, permit a constitutional shield to "be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Harris v. New*

*York,* supra, 401 U.S. at 226, 91 S.Ct. at 646, 28 L.Ed.2d at 5. See *State v. Sager,* supra; *State v. Martin,* 530 S.W.2d 447 (Mo.App.1975).

■ The statement was not improperly used for impeachment because the defendant did not on his direct examination testify he was at home at the time of the homicide. As hereafter developed, the cross-examination which resulted in that statement was reasonably suggested by his direct testimony.

In terms of impeaching a defendant's seemingly false statements with his prior inconsistent utterances or with other reliable evidence available to the government, we see no difference of constitutional magnitude between the defendant's statements on direct examination and his answers to questions put to him on cross-examination that are plainly within the scope of the defendant's direct examination.

*United States v. Havens,* supra, 446 U.S. at 627, 100 S.Ct. at 1916, 64 L.Ed.2d at 566. The defendant's statement was properly used for impeachment. *State v. Bulen,* 646 S.W.2d 405 (Mo.App.1983); *State v. Sager,* supra. Cf. *United States v. Havens,* supra.

■ The defendant's next point is that the trial court erred in permitting cross-examination of the defendant beyond the scope of his direct examination in contravention of § 546.260, RSMo (1978), and the Fifth and Sixth Amendments to the Constitution of the United States. He cites no authority to establish this generally alleged error was in fact in contravention of those constitutional amendments. At the trial, he made repeated assertions that his client's statement was taken in violation of those amendments. But no objection was ever made concerning the scope of the cross-examination upon the basis of those amendments. For that reason, the present abstractly stated constitutional proposition need not be given further consideration. *State v. Miller,* 593 S.W.2d 895 (Mo.App. 1980). For those interested see *Fitz-*

*patrick v. United States*, 178 U.S. 304, 20 S.Ct. 944, 44 L.Ed. 1078 (1900). Also see *Harrison v. United States*, 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047, 1051 (1968), in which it was said, "A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him."

The pertinent part of § 546.260 states no defendant "shall be required to testify, but ... shall be liable to cross-examination, as to any matter referred to in his examination in chief, and may be contradicted and impeached as any other witness in the case; ...." On direct examination, in contradiction of the testimony of Tracy Wallace, the defendant said that in the late afternoon the day of the homicide, he was playing basketball at the Boy's Club. A friend of the defendant also so stated. The defendant, in an apparent explanation of his shoe print said he played ball on the lot south of the Halbert home. He then denied he shot Thomas Halbert.

During cross-examination, the prosecutor asked the appellant, "Where were you at about 8:30 p.m. on October 20—." An objection on the basis of the statute was then made and overruled. Subsequently, the prosecutor asked the defendant when he was last at the Tracy Wallace house. The same objection was made and again overruled.

■ Section 546.260 does not confine cross-examination by the state to a mechanical interrogation seeking a repetition or recantation of the words uttered by a defendant on direct examination. *State v. Murphy*, 592 S.W.2d 727 (Mo. banc 1979). The nature of the defendant's testimony on direct determines the scope of cross-examination permissible to test the truth of the defendant's assertions. The defendant denied shooting Thomas Halbert. It is a well established principle that by such denial, the defendant covered the whole issue tendered by the charge against him. *State v. Lamborn*, 452 S.W.2d 216 (Mo.1970); *State v. Carter*, 627 S.W.2d 656 (Mo.App.1981). The defendant "was not entitled to deny on direct examination that he committed the crimes and then claim immunity from cross-examination as to his whereabouts at the time of the commission of the crimes." *State v. Carter*, supra, at 658. Or, stated another way, "The state has a right to make an inquiry which casts doubt upon the credibility of defendant's alibi." *State v. Kirksey*, 528 S.W.2d 536, 538 (Mo.App. 1975). "[I]t was quite proper for the state to cross-examine him about his prior inconsistent statements." *State v. Bulen*, supra, at 408. See generally *Fitzpatrick v. United States*, supra.

In this connection, it is appropriate to observe the testimony of the defendant that he was at home at the time of the homicide was dramatically impeached by the testimony of his 13-year-old sister. She testified that about an hour before the disturbance at the Halbert home, Mark and his mother quarrelled. Mark then left the house accompanied by Tracy Wallace. Be that as it may, the cross-examination of the defendant was within permissible limits. *State v. Murphy*, supra. The judgment is affirmed.

PREWITT, C.J., HOGAN, P.J., and CROW, J., concur.