# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
December 7, 1999, Session

## STATE OF TENNESSEE v. RONALD WEEKS, SR.

**Direct Appeal from the Criminal Court for Shelby County**
**No. 97-12318      James C. Beasley, Jr., Judge**

---

**No. W1998-00022-CCA-R3-CD - Decided October 2, 2000**

---

NORMA MCGEE OGLE, J., dissenting.

I must respectfully dissent because, while I agree that the appellant's confession to the police should have been suppressed, I do not believe that the trial court's admission of the confession at trial constituted reversible error. Our supreme court has previously noted that "the existence of a constitutional error does not automatically entitle a defendant to a reversal." State v. Howell, 868 S.W.2d 238, 252 (Tenn. 1993). Specifically, constitutional error does not warrant reversal if the State establishes "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828 (1967). In Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436 (1986)(citations omitted), the United States Supreme Court explained the rationale of this "harmless error doctrine":

> The harmless error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, . . . and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error. . . . 'Reversal for error regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it' . . . .

Of course, the court in this case is applying the harmless error doctrine to the admission at trial of a confession by the appellant obtained in violation of Miranda v. Arizona, 384 U.S. 436, 445, 86 S.Ct. 1602, 1612 (1966). Nevertheless, in Arizona v. Fulminante, 499 U.S. 279, 306-312, 111 S.Ct. 1246, 1263-1266 (1991), the Court approved the application of the harmless error doctrine even to the admission at trial of *involuntary* confessions. The Court stated:

> When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt.

Id. at 310, 1265.

In sum, even in cases of erroneously admitted confessions, whether involuntary or obtained in violation of Miranda, "the goal of harmless error analysis is to identify the actual basis on which the jury rested its verdict." Momon v. State, 18 S.W.3d 152, 168 (Tenn. 1999). Thus, in applying the harmless error doctrine to this case, I would preliminarily note that the primary issue at trial was not whether the appellant committed the offense of aggravated sexual battery but rather whether the appellant was insane at the time of his offense. Indeed, the focus of the appellant's defense is apparent from the direct testimony by the appellant's psychologist, Dr. John Victor Ciocca, relating the appellant's statements to him concerning the offense and remarking that the statements were substantially identical to the appellant's confession to the police. In this context, the court's application of harmless error analysis should address three separate inquiries: (1) whether the trial court's admission of the appellant's statements to the police affected the jury's resolution of the issue of insanity; (2) whether the admission of the statements otherwise affected the jury's verdict of guilt; and (3) whether the appellant could have asserted a more successful defense had the statements been suppressed.

With respect to the first inquiry, the appellant had the burden at trial of proving his insanity by clear and convincing evidence. Tenn. Code Ann. § 39-11-501(a) (1997); see also State v. Perry, No. 01C01-9710-CC-00467, 1999 WL 233522, at *16 (Tenn. Crim. App. at Nashville, April 22, 1999), perm. to appeal denied, (Tenn. 1999)(upholding the constitutionality of the statutory provision requiring the defendant to prove insanity by clear and convincing evidence). In other words, the appellant was required to prove by clear and convincing evidence that, as a result of a severe mental disease or defect, he was unable to appreciate the nature or wrongfulness of his conduct at the time of his offense. Id.; see also State v. Holder, No. 03C01-9812-CC-00439, 1999 WL 771550, at **7-8 (Tenn. Crim. App. at Knoxville, September 27, 1999), perm. to appeal denied, (Tenn. 2000)(upholding the constitutionality of the current statutory definition of insanity). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" Holder, No. 03C01-9812-CC-00439, 1999 WL 771550, at *5 (quoting Hodges v. S.C. Toof & Company, 833 S.W.2d 896, 901 n.2 (Tenn. 1992)).

A more detailed review of the evidence adduced at the appellant's trial is essential in assessing the impact of the admission of the appellant's confession to the police upon the jury's resolution of the above issue and, more broadly, the issue of guilt or innocence. Initially, the State presented the testimony of the victim, who was six years old at the time of the appellant's trial. She testified that the appellant lived next door to her home. On July 24, 1997, she was riding her bicycle past the appellant's home when he invited her inside. The victim stated that, while she was visiting the appellant's home, she went into his bedroom where "something bad happened." She further testified that she was later examined by a nurse "[b]ecause of what Mr. Ronnie did." She was unable to otherwise describe the events inside the appellant's bedroom.

The victim's mother also testified on behalf of the State at the appellant's trial. She recounted that, on July 24, 1997, the victim left their home at 10:30 a.m. to visit a friend who lived in the neighborhood. Approximately one hour later, the victim returned home and was "extremely upset." Seconds later, the appellant arrived at the front door in "red satin-type boxer shorts" and stated that he had seen the victim riding her bicycle and had asked her to come inside his house. He further stated,

> I'm sorry . . . I was asleep. The phone rang three times. I woke up.
> I got mad. I'm sorry. I was asleep. I didn't know what I was doing.
> I'm sorry.

After reassuring the appellant, the victim's mother spoke with the victim. The victim "was so upset that she was, at that point of almost throwing up." According to the mother, the victim stated,

> Mama, mama. He forced me, mama. He forced me. . . . He forced
> me to take off my shorts and my panties, mama. . . . He laid on top of
> me, mama, and he peed on me, mama.

The victim's mother reported the assault to the police and drove her daughter to the Memphis Sexual Assault Resource Center. Steven Weichman, a special agent forensic scientist with the Tennessee Bureau of Investigation Crime Laboratory in Jackson, Tennessee, testified that subsequent testing of the underwear worn by the victim at the time of the offense revealed the presence of sperm and semen.

Of course, the State also introduced the appellant's confession, which was obtained by police approximately five hours following the instant offense. In his confession, the appellant stated that, on the morning of his offense, he was attempting to sleep in his bedroom at home. However, he was awakened on several occasions by the ringing of the telephone. Additionally, the appellant was experiencing pain in his back, and he was concerned that he might be developing kidney stones. At approximately 11:15 a.m., he was still unable to sleep and began looking out a window of his home. At this point, he noticed the victim passing by his home on her bicycle. He invited the victim into the house, where he spoke with her about Disney World and allowed her to see his dog and his bird and play with his cat. The victim was playing with the cat in the appellant's bedroom when the appellant "started losing [his] mind." The appellant recalled that he began to feel hungry, the pain in his back resumed, and he again began to worry about the possibility that he was developing kidney stones. According to the appellant, his discomfort precipitated the sexual assault. The appellant recalled,

> I laid down on her and just rubbing and that's where I ejaculated, I
> told her sorry and then I got the towel and tried to clean her up. I was
> again checking for kidney stone but uh there was no problem there.
> But I told her I said I am very sorry . . . . I told her to go on out, but
> I do feel guilt and decided I would walk over there and knock and tell
> her mother that I was very apologetic about what I had done and that
> I was sorry and so.

In support of his defense of insanity, the appellant first introduced the testimony of his wife, Vicki Weeks. Ms. Weeks testified that she and the appellant had been married for twenty-

five years and currently had one adult son. Ms. Weeks described the appellant as "outgoing" and "very friendly" and asserted that he had been "a very good husband . . . ." Ms. Weeks further related that her husband had been employed by the United States Postal Service for twenty-four years and enjoyed playing tennis in his free time. In 1997, however, the appellant began to experience stress relating to financial difficulties, appeared "real tired all the time," and bathed and shaved less frequently. Additionally, the appellant was reluctant to take leave from work and was somewhat withdrawn at family gatherings. Finally, Ms. Weeks noted that, at the beginning of July 1997, the appellant stopped playing tennis.

Mae Weeks, the appellant's mother, testified that the appellant has been hearing-impaired since birth, although he can hear some sounds such as the ringing of a telephone. As a child, the appellant initially attended an "oral school for the deaf" where he was taught to speak. Subsequently, he attended Raleigh-Egypt High School, "a hearing school," where he was "the leader in his class." Upon graduating from the high school, he immediately began his employment with the Postal Service. The appellant's mother, like his wife, described the appellant as "real outgoing - real pleasant - funny - clowned a lot." However, she recalled that, in the spring or early summer of 1997, the appellant began to appear depressed, "looked haggard . . . unkempt," and was withdrawn at family gatherings.

The appellant's son, Ronald Weeks, Jr., testified on the appellant's behalf that he has always had a good relationship with his father. He stated that the appellant was "[v]ery outgoing . . . [a]lways cutting up - joking. He was like a friend." However, Mr. Weeks recalled that, in 1997, the appellant began to appear "unkempt" and became "very quiet, reserved." Mr. Weeks particularly noted that, shortly before this offense, the appellant stopped playing tennis with his son.

The appellant's psychologist, Dr. Ciocca, testified that he interviewed the appellant on four occasions following this offense, including August 16, 19, and 22, 1997, and January 27, 1998. During these interviews, the appellant related to Dr. Ciocca his offense. Dr. Ciocca also reviewed the appellant's statements to the police and noted that the two accounts were substantially identical. Additionally, Dr. Ciocca interviewed various family members. Finally, he administered to the appellant various psychological tests, including the Minnesota Multi-Phasic Personality Inventory II (MMPI) and the Millon Inventory II.

> Dr. Ciocca diagnosed the appellant with
> severe depression - major depression and that co-existing with that
> was a paranoid delusional disorder in which he suffered from the
> inability to tell reality from fantasy in which his reality testing was
> impaired, and in which his ability to govern his behavior would be
> impaired.

Dr. Ciocca conceded that hearing-impaired individuals "have modest additions to . . . all of their MMPI scales," and individuals facing criminal charges are likewise more depressed and suicidal. Nevertheless, he opined that, at the time of this offense, the appellant was in the midst of a

rather long-standing psychological decompensation; that his - his difficulties with reality testing and his difficulties with depression, and his difficulties with distortions of reality had been occurring over an extended period of time.

Dr. Ciocca further testified that, when depression is accompanied by a paranoid delusional disorder, "an individual will, periodically, with and without external stressors, . . . lose contact with reality . . . ." Accordingly, he asserted that the "occurrence of many different kinds of bizarre, unusual behavior in an individual," such as the instant offense, would be consistent with his diagnosis. He concluded that, at the time of the instant offense, the appellant was experiencing a psychotic episode and was unable to comprehend the nature and wrongfulness of his conduct.

The psychologist conceded that the appellant's psychotic episode would have lasted several hours. Indeed, Dr. Ciocca assumed that the appellant's "decline into this [psychotic] state took some time and that his movement out of the state took some time." Dr. Ciocca further conceded that he was unsure how much time elapsed between the appellant's offense and his apology to the victim's mother and was unsure whether or not the appellant was still experiencing the psychotic episode when he apologized to the victim's mother following this offense.

In cross-examining Dr. Ciocca, the State questioned him concerning the appellant's statements to the police, including a portion of the appellant's confession that had been redacted from the statements introduced during the State's case-in-chief. In the redacted portion of his confession, the appellant stated that a similar incident had almost taken place with another child, but he had controlled his conduct because he realized that his impulse was wrong. Again, Dr. Ciocca conceded that the appellant had provided substantially identical information to him during the course of the psychologist's interviews with the appellant and that he had considered this information in forming his opinion on the issue of insanity. With respect to the appellant's statement concerning this prior incident, the trial court instructed the jury that it was to consider this evidence solely for the purpose of evaluating Dr. Ciocca's testimony concerning the appellant's mental state at the time of the offense.

In rebuttal, the State presented the testimony of Kenneth Fulmar, the manager of the Bartlett Men's Single Tennis League. He testified that the appellant was a participant in the tennis league and had won the tennis league tournament on June 16, 1997, approximately one month prior to this offense. The State also presented the testimony of Bob Jackson with the United States Postal Service. Mr. Jackson testified that the appellant was a "general expediter," responsible for ensuring that outgoing mail bags were placed in the correct truck or van. According to Mr. Jackson, the appellant's work evaluation from May 1997 through July 1997 indicated above average job performance by the appellant in all categories, including reliability, appearance, personal conduct and integrity, ability to get along with others, ability to accept criticism, productivity and work habits, attitude toward work, co-workers, and supervisors, ability to understand and follow instructions, willingness to handle all assignments, punctuality, and safety consciousness. Mr. Jackson also noted that, during these three months, the appellant took two days of sick leave and

fourteen or fifteen days of "annual leave." Mr. Jackson acknowledged that the period extending from May through July is generally "peak annual leave time."

The State also presented the testimony of Dr. John Whirley, a psychologist and a friend of Dr. Ciocca. He stated that he interviewed the appellant on July 2, 1998, approximately one year following the instant offense, in order to determine if the appellant was competent to stand trial and whether a defense of insanity was viable. Dr. Whirley additionally reviewed numerous records documenting the appellant's treatment and evaluation following this offense by psychologists Dr. Ciocca and Dr. Murphy and psychiatrist Dr. Hoehn. Finally, he examined records pertaining to police interviews with the appellant.

Dr. Whirley initially noted that, prior to the instant offense, the appellant had no history of mental illness or psychological treatment. As to the psychological testing performed by Dr. Ciocca and the results thereof, Dr. Whirley testified that the scoring systems for tests such as the MMPI and the Millon Inventory are based upon "normative or standardized group[s]" representing the general population. According to Dr. Whirley, when a test subject is a member of a sub-group of the population, such as the hearing-impaired, "you can get biased scores." He also noted that the Millon Inventory II test performed by Dr. Ciocca had been "taken off the market. . . . The Millon II apparently was over exaggerating pathology in even normal people - making them look like they had problems . . . ." Finally, Dr. Whirley noted that the results of the psychological testing were inconsistent with all other available information, including the appellant's other psychological records, Dr. Whirley's own observations of the appellant, and information provided by the appellant's family members.

> In this regard, Dr. Whirley observed that the results of the psychological testing describe[] a severe psychological disorder, florid psychotic process, which includes personality decompensation, social withdrawal, disordered affect, erratic, maybe assaultive behavior, confused, withdrawn, preoccupied with abstract ideas, may feel that others are against him because of his beliefs, apathetic and so forth. In other words, it describes a very disorganized, withdrawn, floridly psychotic individual in the text of this thing.

> I find that this description - if a person were as psychotic and disorganized as this description suggests, I cannot imagine how he could sit down and interact in a fashion that is revealed in the interviews - both with Dr. Ciocca and with the police and also in his written responses to Dr. Ciocca's questions. Now, those are inconsistent with what the MMPI says. The MMPI is also inconsistent with my experience with him, but that was certainly one year later. And it was inconsistent with some of the family descriptions as well.

-6-

> One of the things that both of the - the Millon and the MMPI
> suggested is that these are, to some extent, long term personality
> characteristics of him, and that is certainly not consistent with my
> perception of Mr. Weeks.  I found him to be a likeable, pleasant,
> responsive individual.
>
> * * *
>
> [I]t would be extraordinary for a person with a severe case of
> paranoid schizophrenia to be able to function well in society without
> medication and have good interpersonal relationships and function
> well on a job involving working with other people.  So that's part of
> where I get into some concern about what this test is really saying . .
> . .

Dr. Whirley further noted that if the MMPI were accurate, one would expect the appellant to exhibit "rage and [experience] violent episodes," and there was simply no evidence of such behavior by the appellant.  Dr. Whirley concluded that the symptoms described by family members were more consistent with depression than any paranoid psychosis.  Indeed, Dr. Whirley noted that the psychiatrist Dr. Hoehn limited his diagnosis of the appellant to "major depression - single episode" and administered anti-depressant medications rather than anti-psychotic medications.

In reference to Dr. Ciocca's testimony that, at the time of this offense, the appellant was experiencing a psychotic episode during which he was unable to appreciate the wrongfulness of his conduct, Dr. Whirley described a "brief psychotic episode":

> It includes the presence of delusion - one or more delusions,
> disorganized speech, or grossly disorganized or catatonic behavior
> and that this episode should last at least one day but less than one
> month . . . .

He further stated, "In my experience, it's rare to see something happen and last just a couple of hours."  He observed that people may " come out . . . [of a psychotic episode] over days, but to go in and out briefly would be something I haven't seen."  He concluded that, at the time of this offense, the appellant was able to appreciate the wrongfulness of his conduct.

The State specifically questioned Dr. Whirley concerning the appellant's statements to the police.  Dr. Whirley responded that, in forming his opinion on the issue of insanity, he did rely in part upon the appellant's statement to police that he had immediately apologized to the victim's mother following his offense.  He similarly noted the appellant's account of a prior incident with another child during which the appellant controlled his behavior because he understood the wrongfulness of his impulse.  Moreover, Dr. Whirley opined that the appellant's reluctance to reveal this prior incident to the police suggested that, at least at the time of his interview with the police, the appellant understood the wrongfulness of his conduct.

Reviewing the above evidence, I would conclude that the trial court's admission of the appellant's statements to the police did not affect the jury's determination that the appellant failed to establish his insanity at the time of the offense by clear and convincing evidence.  In

reaching this conclusion, I acknowledge that, absent the trial court's erroneous admission of the appellant's statements to the police, the State could not have used the statements to impeach a defense witness other than the defendant himself. See, e.g., James v. Illinois, 493 U.S. 307, 311-312, 110 S.Ct. 648, 651 (1990). Moreover, the State could not have used such statements as substantive evidence to rebut the appellant's defense of insanity. See, e.g., United States v. Hinkley, 672 F.2d 115, 132-134 (D.C. Cir. 1982), overruled in part on other grounds by Hudson v. Palmer, 468 U.S. 517, 525-526, 104 S.Ct. 3194, 3200 (1984); People v. Ricco, 437 N.E.2d 1097, 1101 (N.Y. App. 1982); State v. Hubbard, 693 P.2d 718, 721-722 (Wash. 1985). Cf. State v. DeGraw, 470 S.E.2d 215, 222-224 (W. Va. 1996)(consistent with James v. Illinois, when a defendant offers the testimony of an expert in presenting the insanity defense and the expert's opinion is based, to any appreciable extent, on the defendant's statements to the expert, the State may offer into evidence for impeachment purposes the defendant's *contradictory* statements to police obtained in violation of Miranda); Wilkes v. United States, 631 A.2d 880, 889-891 (D.C. App. 1993)(enunciating the same principle). However, as noted earlier, the appellant made substantially identical statements to his own, defense-retained psychologist, Dr. Ciocca. By asserting the affirmative defense of insanity and presenting Dr. Ciocca's testimony in support of his defense, the appellant "waived" any constitutional privilege with respect to his inculpatory statements to Dr. Ciocca that enabled the psychologist to form an opinion on the issue of insanity. See, e.g., Isley v. Dugger, 877 F.2d 47, 49-50 (11th Cir. 1989); Noggle v. Marshall, 706 F.2d 1408, 1416 (6th Cir. 1983). The appellant similarly waived his statutory psychologist-client privilege. See Tenn. Code Ann. § 63-11-213 (1997)(privileged communications between licensed psychologists and client are placed upon the same basis as those provided by law between attorney and client); cf. Bryan v. State, 848 S.W.2d 72, 80-81 (Tenn. Crim. App. 1992). Absent these constitutional and statutory bars, the prosecutor could cross-examine Dr. Ciocca concerning the appellant's statements to the psychologist that were a basis of his opinion. Tenn. R. Evid. 705.

Of course, in rebuttal, the State also questioned its own expert concerning the appellant's statements to the police. Moreover, in forming their opinions on the insanity issue, Dr. Ciocca and Dr. Whirley did not rely solely upon the substance of the appellant's statements to the police, echoed in the appellant's statements to Dr. Ciocca, but also upon the fact of the appellant's confession, i.e., his acknowledgment of wrongdoing soon after the offense, and the coherence of the confession. Nevertheless, particularly in light of the appellant's burden of proof on the issue of insanity, I would conclude beyond a reasonable doubt that the psychologists' testimony concerning the appellant's confession did not tip the balance in favor of the State. First, there was other evidence of the appellant's immediate acknowledgment of guilt following the offense. Second, in certain respects, the appellant's confession supported the appellant's claim of insanity. Thus, during closing argument, defense counsel highlighted the appellant's statement to police that he began to lose his mind prior to the offense and the appellant's somewhat bizarre focus in his confession upon the possibility that he was suffering from kidney stones. Finally, there was abundant other evidence controverting the appellant's claim of insanity and raising serious or substantial doubts concerning Dr. Ciocca's conclusions.

As to the impact of the appellant's statements to the police on the broader issue of guilt or innocence, I acknowledge that the impact was not cumulative because the relevance of the appellant's statements to Dr. Ciocca would have been limited to the issue of the appellant's insanity. Noggle, 706 F.2d at 1416. Nevertheless, the remaining evidence of the appellant's guilt was simply overwhelming. Indeed, aside from his assertion of the insanity defense, the appellant's sole argument concerning his guilt or innocence of aggravated sexual battery related to the adequacy of proof that the appellant had touched the victim's intimate parts or clothing covering the immediate area of the victim's intimate parts. In light of the victim's statement that the appellant laid on top of her and "peed" on her and in light of the presence of sperm and semen on the victim's underwear, I am confident in concluding beyond a reasonable doubt that the admission of the appellant's statements to the police did not affect the jury's resolution of this issue.

Finally, I do not believe that the suppression of the statements would have afforded the appellant a more successful defense. On the one hand, had the appellant chosen to forego an insanity defense and instead testify and deny his commission of the offense, he would have been subject to impeachment by his otherwise inadmissible statements to the police. See, e.g., Oregon v. Hass, 420 U.S. 714, 723-724, 95 S.Ct. 1215, 1221 (1975); Harris v. New York, 401 U.S. 222, 225-226, 91 S.Ct. 643, 645-646 (1971); State v. Harts, 7 S.W.3d 78, 85 (Tenn. Crim. App. 1999); State v. Electroplating, 990 S.W.2d 211, 225-226 (Tenn. Crim. App. 1998)(citing Walder v. United States, 347 U.S. 62, 74 S.Ct. 345 (1954), and United States v. Haven, 446 U.S. 620, 627, 100 S.Ct. 1912, 1916 (1980)). On the other hand, had the appellant chosen neither to testify nor to present an insanity defense, the evidence of his guilt was overwhelming.

For the foregoing reasons, I would conclude that the admission of the appellant's statements to the police was harmless beyond a reasonable doubt and would affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE