Appellant, Jason William Riley, Jr., was convicted of the murder of Deborah Jo Beason, as proscribed by § 13A-6-2, Code of Alabama 1975. The court sentenced appellant to a term of life imprisonment in the State penitentiary.
On the afternoon of August 5, 1980, the body of Deborah Jo Beason was found in her Birmingham apartment. She had been stabbed and strangled. An electrical extension cord was wrapped around her neck several times and tied to a refrigerator in the apartment. The cause of death was determined to be the stab wounds and/or strangulation.
A police investigation led to appellant's arrest on August 6, 1980. Appellant made several statements to police authorities following his arrest and wrote a letter to Circuit Judge Charles Nice in which he admitted killing Beason and another female, Tina Nagy, in Jacksonville, Florida. On appeal appellant contests the introduction into evidence of his second and third statements and the letter to Judge Nice.
Appellant's first statement, which is not challenged, was made on August 6, following his arrest and after properMiranda warnings. This statement was tape recorded and later transcribed. In this statement, appellant admitted being with Beason the night of August 4 and he admitted being with her in her apartment at approximately 6:10 a.m. on the morning of August 5. According to appellant, Beason had been having problems with a man called "Truck," who was to return to Beason's apartment that morning. Beason asked appellant to depart in order that he not get involved in "a hassle" with Truck; and Beason requested that appellant return "in *Page 553 
about an hour or so" to check on her. Appellant stated that he departed and did not return because he could not locate her apartment thereafter.
 I
On August 8, 1980, following proper Miranda
warnings, appellant was shown a green satchel that appellant's wife had obtained from the motel room where appellant was staying when he was arrested. This satchel contained items of jewelry, which appellant stated belonged to himself and his wife. At trial, it was established that certain items found in the satchel belonged to Beason. Appellant also stated that he was born in California, that his parents were deceased, that he had no brother or sister, and that he was raised by an aunt who sexually abused him. (At trial, appellant's mother testified that all of this was untrue.) Appellant was further questioned regarding Beason's murder and he was requested to make a taped statement. Appellant agreed to make a taped statement, but then he decided he would prefer to write a statement. This handwritten statement was as follows:
"8-8-80
2:35 p.m.
"I was read my rights and fully understand them.
 "I left the Blazer Grill with Truck and Debby and then went to Debby's apt. On the way we stopped and Truck forced Debby into intercourse. Then we went on to her apt. where Truck dropped Debby and me off.
 "I went in with her and she put her hand on my crotch. I walked to the couch and sat down, then Debby sat beside me and grabbed me again. I got up to leave and she grabbed my arm insisting that I stay and "FUCK" her. The voice I heard was that of the Aunt who raised me. I swung around and hit her with my right arm and knocked her down. I remember speaking to a man in front of her house and then being a block away from Mama's kitchen.
"Jason W. Riley, Jr."
Prior to writing this statement, appellant requested that the police officers allow him to "speak to a district attorney." Birmingham Police Sergeant George T. Grubbs testified that when appellant made the request, Grubbs stated, "Do you want a district attorney or do you want to talk to an attorney?" Appellant replied, "I want to talk to a district attorney." Grubbs then contacted assistant district attorneys Bob Cahill and Ken Gomany. The assistant district attorneys arrived as appellant was writing his statement.
Appellant argues that his request for a district attorney was, in fact, a request for a public defender, and, therefore, that the statement was obtained in contravention of his right to counsel, guaranteed by Miranda v. Arizona,384 U.S. 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1960), and Edwards v.Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378
(1981). We find absolutely no support for this contention in the record. Appellant was clearly asked whether he wanted an attorney or a district attorney, to which he reaffirmed his desire for a district attorney. Appellant did not testify for the limited purpose of suppressing the statement, nor is there any other testimony which contradicts the testimony of Grubbs. We find, from the record, that appellant at no time attempted to invoke his right to counsel, and, therefore, that the statement was properly admitted into evidence.
 II
On August 22, 1980, Officer Don Warren, of the Jacksonville, Florida, Police Department, arrived in Birmingham to interview appellant. Warren suspected that appellant was an individual known to him as John Edward Traylor (appellant's given name) and Elton Levon Fairchild (an alias used by appellant), who was wanted in Florida for the murder of Tina Nagy.
Sergeant James E. Gay, of the Birmingham Police Department, accompanied Warren when appellant was questioned. Appellant was questioned at the district attorney's office rather than at the city jail. *Page 554 
According to Gay, appellant was informed that he would be questioned about both the Beason and Nagy murders during the interview. Warren read appellant his Miranda rights, and appellant then signed a waiver of rights form. Appellant admitted that he killed Nagy, and then wrote a statement for Warren concerning the Nagy homicide. Warren then asked appellant about the Beason homicide, and appellant stated that, "he killed Debbie also." According to Gay, appellant stated that he and Beason were engaged in sexual activity when Beason began "moaning and groaning," and the sound reminded him of Nagy, at which point he obtained a knife and stabbed her in the chest and back. Following this disclosure, Grubbs was called in and appellant reaffirmed his confession to the two murders.
Gay testified that, around this time period, they took a lunch break. Appellant requested that he be allowed to contact his wife, who was then a patient at University Hospital in the psychiatric unit. Appellant gave Gay the phone number, and Gay contacted the hospital. Gay left a message for Mrs. Riley, who returned the call several minutes later. Appellant and his wife engaged in a lengthy conversation, lasting approximately one hour, in which appellant told his wife that his real name was John Edward Traylor, and that while serving time in prison, he had changed his name to Elton Levon Fairchild. Appellant also told his wife about the Nagy and Beason homicides. Gay dictated the substance of appellant's conversation, and these notes were used at the suppression hearing to relate what appellant had stated.
After the lunch break ended and appellant had talked with his wife, Gay requested that appellant make a taped statement. Appellant declined to make a taped statement, but agreed to write one. Appellant's attorney, Pete Johnson, arrived before appellant put his statement in writing. After appellant conferred with Johnson, no further statement was made, and appellant did not reduce his prior statement to written form.
 (a)
Appellant raises three issues regarding the admissibility of his oral statements made on August 22, 1980. Appellant first contends that he received no Miranda warnings regarding the Beason homicide. This factual contention is without merit. Appellant was clearly informed of hisMiranda rights prior to being questioned about the Nagy and Beason homicides. Gay recited the warnings given to appellant by Warren, and those rights were in full compliance with Miranda. According to Gay, appellant signed a written waiver form provided by Warren; however, this form was not introduced into evidence.
Appellant also contends that he was not informed that the Beason homicide would be discussed, and that he should, therefore, have been given a second set of Miranda
warnings. We find no merit to this contention. Gay testified that appellant was informed at the beginning of the interview that he would be questioned about both homicides. There is nothing in the record to substantiate appellant's claim that he was not so informed.
 (b)
Appellant next contends that the statements made on August 22 should have been excluded because police authorities were aware that appellant was represented by counsel, and yet proceeded to question him without contacting his counsel. It is argued that the interview was conducted in violation of appellant's Sixth Amendment right to counsel.
In Jackson v. State, [Ms. 6 Div. 767, April 9, 1985] (Ala.Cr.App. 1985), we recognized that the Fifth and Sixth Amendment rights to counsel may apply in different contexts, and have different purposes. See Edwards v. Arizona,451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); RhodeIsland v. Innis, 446 U.S. 291, 100 S.Ct. 1682,64 L.Ed.2d 297 (1980); Brewer v. Williams, 430 U.S. 387,97 S.Ct. 1232, 51 L.Ed.2d 424 (1976); Miranda v. Arizona, supra. The Sixth Amendment right to counsel "means at least *Page 555 
that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him — 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' "Brewer, 430 U.S. at 398, 97 S.Ct. at 1239. Once adversary proceedings have commenced against an individual, the Sixth Amendment guarantees him the right to legal representation when the government interrogates him.Id. at 401, 97 S.Ct. at 1240-41. However, as stated inJackson:
 "An accused may waive his right to have counsel present at an interrogation at a critical stage after counsel has been retained or appointed, the burden being on the prosecution to show that the waiver was voluntarily, knowingly, and intelligently made, and that the accused intentionally relinquished a known right or privilege to have his counsel present during questioning. . . . That a constitutional right, such as the right to counsel, may be waived is not questioned. . . . Thus, the fact that a defendant has an attorney does not mean, as a per se rule, that law enforcement officials cannot procure a statement of any kind from the defendant without prior notice to, and the consent of, his attorney." (Citations omitted.)
Appellant was formally charged, by way of affidavit and warrant, with the murder of Deborah Jo Beason on August 8, 1980, at 4:40 p.m. On August 18, 1980, a preliminary hearing was held in which Honorable Pete Johnson was appointed to represent appellant. Clearly, on August 22, 1980, formal adversarial proceedings had commenced. The question we are called upon to resolve is whether appellant voluntarily, intelligently, knowingly, and intentionally relinquished his Sixth Amendment right to have counsel present when he confessed to the Beason murder on August 22. In resolving this issue, we review the totality of the circumstances surrounding the giving of appellant's oral confessions, upon which we must rest our determination of whether appellant did effectively waive his constitutional rights. See Fare v. Michael C.,442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). The following sequence of events led to appellant's oral confession:
 August 6, 1980 — Miranda rights were read to appellant by Sgt. Grubbs as appellant was being transported to city hall for questioning. Appellant was informed as follows: "You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning if you wish one. If you decide at any time to exercise these rights and not answer any questions or make any statements you can stop talking to us at any time." Appellant stated that he understood those rights and was willing to talk with the police. Nothing concerning the Beason murder was stated at this time.
 August 6, 1980 — Upon arrival at city hall, Sgt. Grubbs read appellant his Miranda rights exactly as quoted in # 1 above. Appellant was asked if he understood those rights and he stated that he did, and agreed to cooperate with the authorities. Hair and fingernail samples were obtained from appellant.
 August 6, 1980 — Appellant agreed to make a taped statement. Prior to making the taped statement, appellant was again informed of his Miranda rights exactly as quoted in # 1 above. Appellant was asked, "Do you understand those rights?" to which appellant responded, "Yes, sir." Appellant was then asked, "And having knowledge of those rights do you wish to discuss this case with us now," to which appellant responded, "Yes, sir." This colloquy was contained in the recorded statement. Appellant signed a form acknowledging that Grubbs had read him his rights.
 Sgt. Grubbs asked appellant if he could read and write, to which appellant responded that he could. Grubbs requested that appellant read a portion of the *Page 556 Miranda form he signed. From this form appellant read as follows: "I have read the above and understand fully each of these rights. Having these rights in mind I wish to make a voluntary statement and answer any questions without contacting an attorney or having one present. No force, threats or promises have been used by anyone in any way to make me sign this, and I sign this statement after having been orally advised of my constitutional rights set out above and understand them in full." Appellant then continued to make a taped statement which has been discussed previously in this opinion.
 August 8, 1980 — Appellant was taken to city hall for questioning regarding the items found in the green satchel. Grubbs advised appellant of his Miranda rights exactly as quoted in # 1 above. Appellant indicated that he understood those rights and that no threats, force, or promises were made in order to get appellant to cooperate. In this interview, appellant made two oral statements and one written statement. In the written statement, appellant acknowledged that he was read his rights and fully understood them. The written statement was made at 2:35 p.m.
 August 8, 1980 — Appellant was formally charged at 4:40 p.m. with the murder of Deborah Jo Beason.
 August 18, 1980 — A preliminary hearing was held in which counsel was appointed to represent appellant.
 August 22, 1980 — Appellant was taken to the district attorney's office to be questioned about the Nagy and Beason homicides. Warren informed appellant of his Miranda rights, which were as follows: "You have the following rights under the United States Constitution. You do not have to make a statement or say anything. Anything you say can be used against you in a court. You have the right to talk to a lawyer for advice before you make a statement, or before any questions are asked of you, and to have a lawyer with you during any questioning. If you cannot afford to hire a lawyer, one will be appointed for you before any questioning if you wish. If you do answer questions you have the right to stop answering questions anytime and consult with a lawyer." Appellant signed the form which contained this explanation of rights and the form was co-signed by Warren, Gay, and Grubbs. No threats, force or promises were made to induce appellant to talk with the officers. Appellant then made an oral statement admitting he killed Beason. Appellant was then allowed to contact his wife and this conversation was reported by Gay. Appellant then agreed to make a written statement, which was not done due to the arrival of appellant's counsel.
Additionally, we note that appellant was thirty years of age during August 1980. Appellant had attended school until age sixteen, when he voluntarily withdrew. Appellant could, obviously, read and write, and he described himself as "street wise." According to appellant's mother, he had been in trouble with police authorities since he was a teenager. Appellant was convicted of arson in Florida and was incarcerated in a Florida State prison from 1975 to 1979.
In United States v. Brown, 569 F.2d 236, 239 (5th Cir. 1978), the Fifth Circuit Court of Appeals held that a Sixth Amendment waiver of counsel was valid, under the facts of that case, where the defendant had a college education, had been an elementary school teacher, had been twice previously advised of her Miranda rights, and had read and signed the F.B.I.'s Miranda warning form prior to making her statement. More recently, the Eleventh Circuit addressed the Sixth Amendment waiver of counsel issue in Tinsley v.Purvis, 731 F.2d 791 (11th Cir. 1984).[1] InTinsley, the defendant orally waived hisMiranda rights *Page 557 
and signed a written waiver form. Id. at 792. The court stated, id. at 794:
 "In the abstract we cannot give meaning to the components of waiver: the knowing and voluntary relinquishment of the right to counsel. We can, with exacting scrutiny, test petitioner's conduct against this standard. When evaluating whether the state had proved waiver, courts indulge in every reasonable presumption against waiver."
In reviewing the facts of the case, the court noted that the defendant indicated he understood his rights and waived them by way of written waiver. The court stated that "[t]he written waiver is a good indication of intentional relinquishment."Id. at 796. It was noted that a capital indictment had been filed against the defendant and that he was aware of that fact. Id. The defendant had his rights "explained to him on numerous occasions." Id. We believe the facts of the instant case are much more indicative of waiver than those in Tinsley, although we recognize that each case must be judged independently on its facts.
In this case, appellant was informed of his Miranda
rights on four occasions prior to August 22, 1980. On each occasion, he indicated that he understood those rights, waived them, and expressed a desire to talk with the authorities. Appellant signed a waiver form on August 8, prior to making the statements on that date. Appellant could read and write, had an extensive history of involvement with the criminal justice system, and was "street wise." On each occasion, appellant was given the option of taping a statement or writing one. Appellant made one taped statement and one written statement prior to August 22.
On August 22, appellant was informed of his Miranda
rights for the fifth time. These warnings were in full compliance with Miranda, and emphasized appellant's right to counsel before, during, and after questioning. A waiver of these warnings, signed by appellant, clearly informed appellant of his right to counsel at that stage in the proceedings. When appellant's counsel arrived, the police made absolutely no attempt to prevent counsel from conferring with his client. Appellant's request to speak with his wife, in our opinion, indicates that appellant was aware he could communicate with persons other than the police authorities. There were no threats, force, or promises made to induce appellant to make these statements. Appellant had known since August 18 that he had appointed counsel, and at no time requested counsel's presence. Based on these facts, we are convinced that the trial court properly admitted the contested confessions and statements into evidence. We find, after reviewing the totality of the circumstances, that the confessions and other statements made by appellant on August 22, 1980, were voluntarily, intelligently, and knowingly made, and that appellant intentionally and knowingly relinquished his Sixth Amendment right to counsel. We find no error in the trial court's rulings.
 (c)
Appellant lastly contends that these statements were the product of improper inducements because he was taken from "a sweltering cell in an un-airconditioned jail to the cool, clean comfort of the District Attorney's office"; he was fed "outside food rather than jail food"; and he was allowed to contact his wife in a "special telephone conversation." We note that Gay testified that appellant's initial incriminating oral statements were made prior to lunch, which consisted of a sandwich and a Coke, and prior to the phone call to his wife. We find no merit to the argument that Gay "made himself more than a policeman to Appellant" by allowing the phone call. There is no evidence that Gay delivered "personal messages between appellant and his suicidal wife during the two weeks following the arrest and leading up to the confession"; at trial, this was specifically denied by Gay. Considering all the circumstances of appellant's statements, we find that there is absolutely no foundation to appellant's contention that the statements were procured through improper inducements. The statements were properly admitted; *Page 558 
there was no error in the trial court's ruling.
 III
In December 1980, Rod Nelson was employed as a bailiff for circuit judge Charles Nice, of the 10th Judicial Circuit, Criminal Division. Nelson's duties included reviewing mail addressed to Judge Nice. On or about December 10, 1980, Nelson opened a letter from appellant and addressed to Judge Nice. Appellant's case had been assigned to Judge Nice's court. In the letter, appellant admitted his guilt in the slayings of Beason and Nagy, and expressed his desire to plead guilty in order to resolve the case.
Appellant objected to the introduction of this document into evidence because it was not properly "authenticated" by any of the testifying witnesses. Appellant relies on Early v.State, 42 Ala. App. 200, 206, 158 So.2d 495, 500 (1963), for the following proposition:
 "The overwhelming weight of authority in Alabama establishes the doctrine that where a letter is received in due course, it is not admissible as evidence against the purported sender thereof, without proof that he sent it, or proof of his handwriting, unless the same is in reply to a communication sent to him by the sendee thereof."
We find, by the following rationale, that there was sufficient proof of appellant's handwriting to allow the introduction of the letter into evidence.
Section 12-21-39, Code of Alabama 1975, provides the following:
 "In any proceeding before a court or judicial officer of the state where the genuineness of the handwriting of any person may be involved, any admitted or proved handwriting of such person shall be competent evidence as a basis for comparison by witnesses or by the jury, court or officer conducting such proceeding to prove or disprove such genuineness. (Code 1923, § 7707; Code 1940, T. 7, § 420.)"
At the suppression hearing, the court compared the signature on the contested document to appellant's signature contained on the written statement of August 8, 1980 (State's exhibit # 56), and the signature contained on the fingerprint card (State's exhibit # 45). There is no contention that the signature which appears on those documents belonged to anyone other than appellant. We find that the trial court did not abuse its discretion in admitting the letter into evidence.
Appellant also contends that those parts of the letter making reference to the Nagy homicide should have been excluded. However, no objection was made to the document's reference to the Nagy homicide; therefore, we have nothing to review.
Based on the foregoing, this case is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur.
[1] See also Tinsley v. State, 395 So.2d 1069
(Ala.Cr.App.), cert. denied, 395 So.2d 1080 (Ala. 1981).