STATE of Missouri, Respondent,

v.

Donald E. REESE, Appellant.

No. 70555.

Supreme Court of Missouri,
En Banc.

July 31, 1990.

Rehearing Denied Sept. 11, 1990.

Henry B. Robertson, St. Louis, for appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

BLACKMAR, Chief Justice.

The defendant confessed to the killing of four men at a shooting range and to taking the wallets of three of them. He was tried in Jefferson County on change of venue

from Saline County on two counts of first degree murder, found guilty on both, and sentenced to death in accordance with the jury's verdict. This consolidated appeal is from the judgment and sentence, and also from the denial of 29.15 relief. The defendant does not challenge the sufficiency of the evidence, but raises numerous procedural points. We affirm.

## 1. *Admissibility of the Defendant's Confession*

The defendant signed a written confession, in which he revealed the location of the victims' wallets and of the murder weapon. He moved before trial to suppress the confession, contending that it was involuntary, and also that it was the result of unlawful interrogation. He also sought to suppress the wallets and the weapon as evidence, under the "fruit of the poisonous tree" doctrine.[1] The trial judge overruled the motions in a detailed opinion containing findings, conclusions, and order, which we adopt and, with editing, append to this opinion.

The bodies were discovered at approximately 4:15 p.m. on Tuesday, June 9, 1986 at the Marshall Junction Wildlife Reserve shooting range. The victims had been dead a matter of hours. The investigating officers found that the defendant had purchased ammunition of the kind used for the killings. Beginning Saturday, June 13, they undertook a series of interviews with him and conducted a consensual search of his home. On Monday morning June 15, he apparently called a local lawyer to ask what might be done to keep the officers from harassing him, and the lawyer suggested that he employ someone with more experience in the criminal law. There is no indication that he made any further attempts at hiring private counsel. Up to this time he had not been detained, was given no warnings, and made no incriminating statements.

The defendant was arrested about 2:00 p.m. that same day. There is no claim that the arrest was unlawful. He asked the officers whether he should hire a lawyer and was told that they could not advise him about this, but that a lawyer would be furnished if he wanted one. He answered, "forget it." He was then read his *Miranda* rights. He said he understood his rights, signed a written waiver, and was willing to talk, and was questioned from 3:15 to 6:00 p.m. He talked freely, denying participation in the crime.

Shortly after 10:00 p.m. that same evening he was arraigned before Associate Circuit Judge Rick Wilson at the Saline County Courthouse on a complaint charging multiple counts of first degree murder, armed criminal action and robbery. The judge advised him, pursuant to our Rule 22.07(b), of the felonies charged, his right to retain counsel, his right to request the assignment of counsel if he could not afford a lawyer, and his right to remain silent. He said that he did not think he would be able to afford a lawyer, and was told that forms for requesting appointment of counsel were available at the jail. He did not suggest to the judge or the officers that he wanted an attorney. The judge set the preliminary hearing for Thursday, June 18.

The next morning the officers sought to interview him in a room in the sheriff's office next to the jail. They advised him of his Miranda rights and he signed another written waiver form. When an officer offered to telephone an attorney for him he said, "I didn't do it and I don't need an attorney and I don't want one." He said that he had no lawyer for his pending divorce suit.

A deputy sheriff then told him that "you have to have a lawyer at the preliminary hearing" and that policy required him to fill out a form the deputy tendered to determine whether he was financially eligible for the public defender's services. The defendant completed the form, checking "yes" next to the question, "Are you requesting that the public defender be provided as your lawyer?" He then talked with the officers for about an hour and

---

1. *Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1962); *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939).

fifteen minutes about the murders, persisting in his denials and saying that he did not need a lawyer. When told some other officers wanted to talk with him after lunch, he responded that that would be "fine" and that he was willing to talk to them.

Interviewing resumed about 2:30 p.m. Sheriff Darnell told the defendant that he understood that he had been read his Miranda rights, understood them, and had signed a waiver. The defendant confirmed that he understood these rights and was willing to waive them. During the course of the interview he was visited by his wife, at her request, and by his son. At about 6:00 p.m. the appellant began giving a statement admitting that he killed the four men. The statement was reduced to writing and signed at about 8:20 p.m. It contained an express detailing of the Miranda warnings and a further waiver of the rights stated in the warning.

The trial court found that the defendant was fully advised of his Miranda rights, that he understood them, and that his waiver and his statement to the officers was voluntary. There is no indication of overbearing conduct during the interrogation. The findings are amply supported by the evidence.

■ The fifth amendment guarantees a person who is held in custody as a suspect the right to have an attorney present during interrogation. The detainee must be advised of this right and must be informed that an attorney will be appointed for him if he is unable to afford one. If an attorney is requested, questioning must cease. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981), holds that when a suspect in custody has requested an attorney the police may not thereafter inaugurate further questioning, and that a statement obtained by this further questioning may not be received in evidence even though the defendant executes knowing and express waivers of his right to counsel. The Court said that an accused person in custody

> having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the

authorities until counsel has been made available to him.

■ The *Edwards* holding was refined in *Smith v. Illinois,* 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). There the court held that the first inquiry must be as to whether the accused actually invoked his right to counsel. If the answer to this inquiry is affirmative, then the police may not initiate further questioning. The principal holding of the case is that, once a sufficient request for counsel is made, the accused's subsequent declarations may not be received to show that the initial request was ambiguous. But *Edwards* and *Smith* rights attach only if the defendant indicates a desire for the assistance of counsel in his dealings with the police. On this issue the trial court found as follows:

> the record is quite clear that defendant Reese did not feel a need for legal assistance during his questioning by the officers, and that he did not ask to deal with police only through counsel.

This finding is amply supported by the evidence. Even though the defendant spoke to a lawyer and discussed the subject of obtaining a lawyer with the police, he was well aware of his rights and he expressly waived them. We find no violation of his fifth amendment right to counsel.

■ The sixth amendment confers a right to counsel at every "meaningful" stage in the proceedings. Although the defendant may have retained counsel at "arraignment" pursuant to Rule 22.07, the principal purposes of this initial hearing are to determine whether a person arrested without a warrant may be held beyond the 20–hour period specified in Rule 22.06, and to fix the amount of the bond for release, if bond is appropriate. The judge must advise the defendant of the right to counsel, and is directed to proceed with the preliminary examination within a "reasonable time," but there is no suggestion in the rules, and no requirement, that counsel must be provided at the arraignment. There must be immediate decisions about further detention and bail.

■ The defendant argues that *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1985) applies. The facts are` distinguishable because, there, the defendant made an explicit request for counsel when he was arraigned and a law firm was appointed to represent him, even though he was not informed of the appointment. That *Jackson* does not stand for the proposition that the police may not inaugurate interrogation, once the sixth amendment right to counsel arises, is shown by *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988), in which a defendant was arrested after he had been indicted, but had neither asked for a lawyer nor had one appointed for him. The Court held that the police could institute questioning and, provided that the Miranda requirements were observed, could then proceed to take a voluntary statement.

■ We must now consider the effect of the form which the defendant completed and signed at the jail on the morning of June 16 in the light of these cases. The trial court found as follows:

> The public defender form was not directed to the officer and did not interject ambiguity into the clear unequivocal assertions of the defendant, some made only moments before the form was filled out. Even if we assume the form in question was a request for counsel it is equally clear that such request was that an attorney be provided for him in the future, at his trial or at the earliest the preliminary hearing, and not in the questioning which was taking place at that time. . . .

We conclude that this case is closer to *Patterson* than to *Jackson*. Counsel had not been appointed. The defendant's eligibility for the public defender's services had not been determined. There was no request for counsel during interrogation. There was, by contrast, an explicit waiver. The authorities made it clear to the defendant, numerous times, that counsel would be available to him if he would only say the word. The mere mention of counsel by the defendant is not sufficient to preclude further police questioning.[2] There must be a request.

In *Connecticut v. Barrett*, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), the defendant, in response to his second Miranda warning said "he would not give a written statement unless his attorney was present but had 'no problem' talking about the incident." *Id.* at 525, 107 S.Ct. at 830. Afterwards, one of the officers reduced his recollection of the conversation to writing, and the trial court held it admissible. The Supreme Court of Connecticut reversed Barrett's conviction, stating that requests for counsel must be given broad construction, and that the State had not established a subsequent waiver.

The Supreme Court reversed, and, in holding that the Fifth Amendment did not require the exclusion of the statement, said:

> The fundamental purpose of the Court's decision in Miranda was "to assure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process." . . . Barrett's limited requests for counsel, however, were accompanied by affirmative announcements of his willingness to speak with the authorities. The fact that officials took the opportunity provided by Barrett to obtain an oral confession is quite consistent with the Fifth Amendment. Miranda gives the defendant a right to choose between speech and silence, and Barrett chose to speak.

*Id.* at 528–29, 107 S.Ct. at 831–32. The Court also noted that it was not abandoning the rule of broad construction, but rather that no construction was necessary. "Interpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous. Here, however, Barrett made clear

---

2. *United States v. Jardina*, 747 F.2d 945, 949 (5th Cir.1984), *cert. denied* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 833 (1985); *State v. Thomas*, 698 S.W.2d 942, 947 (Mo.App.1985); *United States v. Eirin*, 778 F.2d 722, 728 (11th Cir.1985). *See also People v. Benjamin*, 732 P.2d 1167, 1171 (Colo.1987), in which the defendant had signed an indigency form.

his intentions, and they were honored by police." *Id.* at 529, 107 S.Ct. at 832.

Inasmuch as there was no improper interrogation in this case, there is no occasion for applying the "fruit of the poisonous tree" doctrine to the weapon and the wallets received in evidence. The ruling of the trial court on the motion to suppress is supported by the evidence and we sustain it.

### 2. *Admission of Contents of Wallets*

We find no error in allowing a police officer to testify as to the contents of the victims' wallets. The state was entitled to show that they had been removed from the bodies by the defendant, and they were properly received in evidence. As is the case with most of us, the wallets contained mostly credit cards, along with information indicating that the victims were respectable citizens, one having served in the armed forces and another having done volunteer work. This information is hardly prejudicial to the defendant. There is not the least resemblance to *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), in which a detailed "victim impact statement" was received in evidence, or to *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), in which the prosecutor extolled the victim's character in oral argument by referring to a printed prayer and a voter's registration card found among his personal effects. It is also significant that, in this case, the wallets were properly in evidence and could have been passed to the jury for inspection. One who takes a pocket testament in a robbery may expect that it will be offered in evidence against him.

### 3. *Voir Dire*

The jurors were questioned in panels of 15. The defendant complains that his counsel was not permitted to advise the initial panel of the definition of first degree murder, so as to probe the jurors' views of the death penalty. The record shows, however, that the judge later changed his ruling and permitted subsequent panels to hear the definition. Counsel said that he did not want to recall the jurors on the first panel for further questioning. He thereby rejected the relief tendered and may not now complain.

The defendant also complains about the prosecutor's telling the jurors during voir dire that there would be a penalty phase at which they would have to determine "whether or not certain mitigating circumstances exist that the defendant may want you to consider about his life." It is now argued that the prosecutor was indicating to the jurors that the defendant had some burden of presenting evidence at the penalty phase. Defense counsel did not object until after several questions had been asked and answered. When objection was made the court instructed the jurors to disregard any statement by the prosecutor indicating that the defendant was obliged to introduce evidence of mitigation. We fail to see substantial prejudice in the challenged statements, and believe that the trial court's cautionary instructions were sufficient to make it clear to the jurors that the defendant had no burden of introducing evidence.

### 4. *Other Points—Initial Appeal*

The County Surveyor of Saline county testified that the shooting range was situated in Saline County. Complaint is made that he did not properly trace his survey to a "government corner." Venue is not an essential element of the offense and need only be established by preponderance of the evidence, to the satisfaction of the court.[3] Testimony of the county surveyor and other witnesses who claim that they are familiar with the boundaries of the county may be received and weighed as probative of the location.[4] The precision that may be required in a case involving land boundaries is not required to establish venue in a criminal case.

The challenge to the "reasonable doubt" definition in MAI–CR3d 302.04 has been

---

**3.** *State v. Lingar,* 726 S.W.2d 728, 732 (Mo. banc 1987).

**4.** *State v. Zismer,* 696 S.W.2d 349, 351 (Mo.App. 1985).

rejected in many cases. *See State v. Wacaser,* 794 S.W.2d 190 (Mo. banc 1990).

The defendant complains about MAI–CR3d 313.44, alleging violation of the holdings of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina,* — U.S. —, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), by leading the jury to believe that it may consider only such mitigating circumstances as it unanimously finds. We rejected a similar claim in *State v. Petary,* 790 S.W.2d 243 (Mo. banc 1990).

■ The defendant also objects to the following language:

> You may also consider any circumstances which you find from the evidence in mitigation of punishment.

*Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), is cited for the proposition that the sentencer "may not refuse to consider" any relevant mitigating evidence. This principle is not violated by an instruction which leaves it to the jury to determine what is mitigating, after hearing all the evidence. There is no claim that the defendant was restricted in the offer of mitigating evidence, or in argument about mitigation.

■ It is next argued that the aggravating circumstances of killing during the course of a robbery and killing for pecuniary gain are duplicating. This contention was rejected in *Jones v. State,* 784 S.W.2d 789 (Mo. banc 1990). Contrary to the defendant's assertion, the evidence permitted the jury to find robbery and also a desire to profit. The defendant's admission to another prisoner that he "did it to get money" supports the findings. Even though the prisoner may be an unmitigated scoundrel the weight of his testimony is for the jury to assess.

■ The opposition of the parents of one of the victims to capital punishment is not a material circumstance, and there was no violation of discovery principles in not disclosing this opposition. A criminal prosecution is a public matter and not a contest between the defendant and his victims, or their relatives.

### 5. *The 29.15 Motion*

■ The appellant's amended 29.15 motion complained because appointed counsel failed to allow the defendant to participate in the jury selection or to examine the jury list. Counsel testified at the hearing that he did not believe that the defendant, who resided in a distant county, could be of any assistance in selecting the jury, and that he did not want the jurors to see the defendant examining the list because they might think that he was contemplating retaliation. The trial judge expressly found that the latter decision represented sound trial strategy and that there was no showing of prejudice.

We might say in the abstract that a lawyer should let his client know about court proceedings, answering any questions and considering any suggestions. Recess could be requested if necessary. But a claim of the kind made here, coming after trial, does not entitle the defendant to relief unless some showing of prejudice is made. There is no indication that the defendant knew any of the jurors or could have offered any valuable advice about selecting the jury. The defendant, furthermore, should be required to voice protests of this kind during the initial proceeding, at least when granted allocution. The trial court properly found that there was no evidence of ineffective assistance of counsel.

### 6. *Proportionality Review*

■ This defendant killed four people at the same time. It is not surprising that the jury responded by assessing the death penalty. The case is comparable to *State v. Byrd,* 676 S.W.2d 494 (Mo. banc 1984), involving four murders, and *State v. Young,* 701 S.W.2d 429 (Mo. banc 1985), involving three. The evidence of robbery is also appropriately considered. *State v. Pollard,* 735 S.W.2d 345 (Mo. banc 1987). It makes no difference that the defendant was on trial for only two of these killings. The others may properly be considered. *State v. Leisure,* 749 S.W.2d 366 (Mo. banc 1988). The circumstance that other juries

have not assessed the death penalty for multiple killings does not mandate a different result, especially in the light of the comparable cases cited. The aggravating circumstances relied on are amply supported by the evidence and there is no indication that the verdict was the result of passion and prejudice. Even if the defendant's prior record were without blemish, which was not the case, the atrocity of the offense supports the jury's conclusion. We perceive no basis for mitigating the sentence.

The judgments are affirmed.

All concur.

### APPENDIX

In the Circuit Court of the Twenty–Third Circuit of Missouri at Hillsboro, Jefferson County, Missouri Division Three

County of Jefferson

State of Missouri

State of Missouri, Plaintiff

vs.

Donald Edward Reese, Defendant

Cause No. CR186–1364–FX–J3

Count I–Murder First Degree

Count II–Murder First Degree

Hon. John L. Anderson, Judge

Opinion filed: July, 1987

### FINDINGS, CONCLUSIONS AND ORDER

### I. THE FACTS

On Tuesday, September 9, 1986, a quadruple homicide occurred at a shooting range at the Marshall Junction Wildlife area in Saline County in Western Missouri. Investigation was undertaken by the Missouri Rural Crime Squad—Major Case under the command of Gene Darnell, the Sheriff at Lafayette County, Missouri.

On Sunday, September 14, 1986, defendant Reese was contacted at his Saline County home in Marshall by Missouri Highway Patrol Trooper Gary Lile and a conservation agent on the subject of the homicide. Reese invited the officers into his house and was questioned briefly as to whether he had ever bought any .30 caliber ammunition; defendant answered that he had, and that he had recently sold two firearms of that caliber. The next morning Reese telephoned Marshall attorney George Huff. Reese told Huff that law enforcement officers had come to see him in connection with the murder investigation; that the police visit was potentially upsetting to his marital situation; and that he wanted to know if Huff could stop them from bothering him. Huff replied that, while legal objection might be made to such questioning or to a search, it would probably involve some time and expense, and that if Reese felt these measures to be worth the effort he should probably contact an attorney who was more actively involved in criminal practice. In response, Reese said that he had not realized that the matter would be that complicated, thanked Huff and ended the conversation.

At 2:00 p.m. Trooper Lile and a Sergeant Pappert arrested Defendant Reese for investigation of the homicides. Reese was placed in a squad car and transported to Major Case Squad Headquarters. Sergeant Pappert told Reese that he and Lile were not going to question him and to remain quiet. Reese did not say a word.

At Major Case Squad Headquarters, Reese was turned over to Trooper Dave LePage and Sergeant Bob Anderson shortly after 2:00 p.m. Trooper LePage was aware that Reese had not been advised of his rights. As Officers LePage and Anderson were preparing to fingerprint and photograph him, Reese inquired of LePage if he (LePage) should be doing what he was doing. Thereafter, Trooper LePage presented the Missouri State Highway Patrol Notification and Waiver of Rights form to Reese. LePage read Reese his Miranda rights from the form (State's Exhibit # 1); questioned him about his understanding of them, and had him read the waiver portion of the rights form aloud after which Reese signed the form. His signature was witnessed.

Trooper LePage made no effort to interrogate Reese with regard to the quadruple murder at the wildlife reserve. While being fingerprinted, Reese asked LePage, "Do you think I need a lawyer for this?" LePage responded, "I can't advise you or not whether you need a lawyer, but if you would want a lawyer we will get you a lawyer". Reese just kind of shrugged and said, "you know, forget it and let's go on," or words to that effect. "Do what you are doing". "Forget it".

Later that afternoon Sergeant John Gordon of the Highway Patrol was directed by the Major Case Squad Commander Gene Darnell to interview Reese. Sergeant Gordon met the defendant at 3:15 p.m. in a room adjacent to the main police office. Gordon explained that he had been told that Reese had already been advised of his Miranda rights and that he wanted to talk to the defendant about the killing of four people in the wildlife area, but that before he did, he wanted to make certain that the defendant understood the rights he had previously been told about. Without prompting by Gordon, the defendant stated his understanding that he had the right to remain silent and to have an attorney present, and the officer then read the balance of the Miranda rights to him from a waiver form (State's Exhibit # 2). Reese told Gordon that he understood his rights and wanted to talk to the officers. With particular regard to his right to have an attorney present during questioning, Reese stated that he did not want a lawyer because he had done nothing to need the services of an attorney. Sergeant Gordon interviewed Reese for no more than two hours, with a break in the middle. While the defendant ate a sandwich, Gordon separately conferred with Sheriff Darnell and other officers. Throughout this questioning, Reese denied any involvement in the murders. Shortly after 6:00 p.m., Sergeant Gordon asked Reese if he would sign a consent to search his residence, and he did so.

At 10:00 or 10:30 on the evening of the 15th, Reese was arraigned before the Honorable Rick Wilson, Associate Circuit Judge, 15th Judicial Circuit (Saline County). Judge Wilson advised the defendant, *inter alia*, that he had a right to be represented by counsel at all stages of the proceedings and to have counsel appointed if he could not afford one.

At some point during the arraignment, Reese turned to the officers escorting him and stated, "I don't think I'd be able to afford a lawyer". Deputy Brown made a statement to the effect that there were forms to fill out in the jail.

At some point during the arraignment, Reese made a comment to the judge that he would be in jail instead of working. The contextual setting of that comment is somewhat vague from the record. At no time did Reese suggest to the judge or the officer present that he wanted an attorney or that he desired to have counsel appointed. Oddly, the judge never asked the defendant directly if he wanted a lawyer, leaving it to Reese to initiate any such request.

Prior to concluding the arraignment, Judge Wilson advised Reese that his first hearing would be calendared for Thursday, September 18, 1986, which would be the first day that Public Defender Dennis Rolf would be available to consult with those prisoners who request his services. This was the judge's standard procedure in all cases unless the accused indicated they had private counsel.

When he was returned to the Saline County Jail, Reese made no request of jail personnel that a lawyer be obtained for him.

On the morning of September 16, 1986, Sheriff Darnell assigned Highway Patrol Sergeant Robert North and Saline County Deputy James Brown to interview Reese and find out whether he was aware of the back entrance at the shooting range. North and Brown were aware that Reese had been arraigned.

North and Brown met the defendant at approximately 10:00 a.m. in a report-writing room in the sheriff's office, adjacent to the jail. After introductions, Sergeant North read Reese his Miranda rights, and

Reese again filled out and signed a Miranda waiver form (State's Exhibit #3). North offered to telephone an attorney for the defendant if he wanted one, Reese replied, "I didn't do it and I don't need an attorney and I don't want one."

Brown asked if Reese had a lawyer representing him in his pending divorce and whether he would like to talk to that attorney. Reese responded that he did not have a divorce lawyer and did not want to call any attorney.

The officers told Reese that his preliminary hearing would be coming up on the 18th and that he would need an attorney for that court date. Throughout this conversation, defendant was relaxed, calm and lucid, and was not threatened by the officers in any manner.

Even though Reese had repeatedly refused the services of a lawyer during questioning, the pleasant but officious jailer, Deputy Brown, told Reese, "You have to have a lawyer at the preliminary hearing", and that policy required defendant to fill out a form to determine eligibility for the services of the Public Defender. The form to which Brown alluded to is one used throughout the State and is provided through the Public Defender Commission. The Saline County jail kept a supply because the Public Defender rides the Circuit and is only available on a regular basis on Thursdays. Brown obtained a copy of the form in question from the jail supply (Defendant's Exhibit "B").

Brown was anxious about the matter of having the form filled out because of his perception that the court did not want prisoners produced who might receive Public Defender assistance if those prisoners had not completed the form. The form in question primarily elicits financial information used to determine eligibility.

Brown, on his own initiative and as a housekeeping measure, gave Reese a copy of Defendant's Exhibit "B" and told Reese to fill in all of the blanks. Defendant did so, twice asking the officer questions as to how to answer inquiries on the form.

Next to the question, Number 2, "Are you requesting that a public defender be provided as your lawyer?" defendant checked "Yes".

According to Deputy Brown, not every prisoner completes this form. Brown does not ordinarily go from cell to cell and require prisoners to fill out the form. It is a policy that the form be available, but not that everyone be made to fill it out.

When Reese completed the form, Deputy Brown checked to see if all blanks were filled and Brown witnessed Reese's signature.

Brown was unfamiliar with the contents of the form as he had never read it and had not done so even at the time of this hearing. This would be consistent with Deputy Brown's personality and character. He does not seem to be one given to curiosity, but rather someone content to accept the directions of others without question.

After completing and signing the form, Reese proceeded to talk with North and Brown about the murders for about an hour and fifteen minutes. He admitted that he knew about the back entrance into the gun range and that he had shot there with his son two weeks previously, but continued to deny any involvement in the killings.

At around 11:15 to 11:30, when they heard lunch was being served at the jail, the officers told Reese that they would stop the interview so he could have lunch if he wanted. As he took Reese back to his cell, Deputy Brown told him that some other officers wanted to come over and talk to him that afternoon and asked if that would be all right. Defendant responded that it would be "fine" for them to come and that he was willing to talk to them.

At 2:30 that afternoon, Deputy Brown returned with Sheriff Darnell to talk with defendant. Darnell first confirmed with Reese that he had been read his Miranda rights by other officers the previous day and that morning and that he understood those rights. Reese indicated once again that he understood and wanted to waive his rights. Because the interview room was occupied, defendant and the officers stood

and talked in a public kitchen for thirty minutes until the room was available. From 3:00 to 6:00 p.m., Darnell and Brown interviewed the defendant for about an hour and forty-five minutes, and during the remaining time defendant was visited twice by his wife and once by his son. The visits by defendant's wife were at her own request, not Darnell's, although he felt that she might induce defendant to talk. At 6:00 p.m., Reese gave a written statement to Sheriff Darnell in which he admitted shooting four men to death in the Marshall Wildlife Area (State's Exhibit # 4). The taking of this statement lasted until 8:20 p.m. (State's Exhibit # 4). On the face of the statement, which defendant read and signed, was yet another express waiver of his Miranda rights (State's Exhibit # 4). At no time was defendant Reese threatened or denied access to food, water or toilet facilities. At no time did he request an attorney or that questioning cease.

It was Sheriff Darnell's idea that Mrs. Reese take part in the interrogation process and he hoped to exploit her willingness to do so as he viewed her use as a psychological tool beneficial to the State.

Sheriff Darnell did not learn of Defendant's Exhibit "B" until sometime on September 17, 1986. At all times Sheriff Darnell acted in good faith and at no time was there any effort on his part or on the part of his staff to intentionally subvert or circumvent defendant's Fifth Amendment and Sixth Amendment rights nor did anyone consciously and knowingly set out to violate defendant's constitutional rights.

At the conclusion of the evidentiary hearing on the Motion to Suppress, defendant made an offer of proof that Mrs. Reese, the defendant's wife, would testify that on the afternoon of September 16, 1985, prior to defendant's statement, she visited the defendant alone and told him that she was asked by Deputy Brown and Sheriff Darnell to talk with her husband and aid in attempting to get a confession from him and she was told by defendant that he would not talk about it until he had a lawyer (Tr. 329). This statement was never communicated to the police prior to the giving of the statement in issue. The State objected to the introduction of said evidence on the grounds of relevancy and hearsay. The issue of hearsay was ordered briefed.

## II. SIXTH AMENDMENT

Defendant first contends that his inculpatory statement to Sheriff Darnell (State's Exhibit # 4) was obtained in violation of his Sixth and Fourteenth Amendment rights because he was denied the assistance of counsel at his post-arraignment interrogation.

There is no question but that the statement in issue was post-arraignment and that defendant did not have the assistance of counsel at the time he made it and that the taking of the statement fell within the critical stage ambit of the adversary proceedings that had been commenced.

The Sixth Amendment right to counsel attaches at the moment an adversarial proceeding is initiated. *Maine v. Moulton,* 474 U.S. 159 [106 S.Ct. 477, 88 L.Ed.2d 481] (1985); *Brewer v. Williams,* 430 U.S. 387 [97 S.Ct. 1232, 51 L.Ed.2d 424] (1977).

Once the right to counsel has come into being *and has been asserted,* the State must honor it and in so doing must respect and preserve the *accused's choice* to seek assistance of counsel. An affirmative duty is cast upon the State not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel. *Moulton,* 474 U.S. 159 [106 S.Ct. 477, 88 L.Ed.2d 481] (1985).

In this case it is conceded by the State that all interrogations were initiated by the police. Therefore, if the defendant asserted his right to counsel, there could be no waiver of either his Fifth or Sixth Amendment rights. *Edwards v. Arizona,* 451 U.S. 477 [101 S.Ct. 1880, 68 L.Ed.2d 378] (198[1]); *Michigan v. Jackson,* 475 U.S. 625 [106 S.Ct. 1404, 89 L.Ed.2d 631] (1986). Even if defendant did not assert his right to counsel, this court must still consider whether the right itself was waived. But first the threshold question must be addressed.

The problem involving defendant's claim that he asserted his right to counsel divides itself into two areas of inquiry. On the one hand we have the public defender application form and on the other the various amorphous references by defendant to his rights. The court will take the more difficult question first. Did defendant assert his right to counsel by executing the public defender application form (Defendant's Exhibit "B") and returning it to Deputy Brown?

The answer lies in the total contextual setting and not merely in the raw act of filling out the form.

To put things into perspective, we should understand that at the time defendant completed the form in question he was well aware of his right to counsel and the willingness of the State to furnish the same if he qualified. He was well aware of his right to interrupt any interview or interrogation pending his obtaining counsel. The immediate setting surrounding the execution of the form is best exemplified by the testimony of Trooper Robert North under questioning by Prosecutor Finnical (Tr. 89–102):

Q At what time did you begin reading the waiver of rights form to the defendant?

A It was approximately 10:05 a.m.

Q After you completed filling out the waiver of rights form did you personally have any discussion with Mr. Reese about his right to an attorney?

A I did.

Q Would you tell the Court exactly what conversation transpired between yourself and Mr. Reese with regard to the defendant's right to an attorney?

A We asked him if he had an attorney. He said "No." We said, "Do you want an attorney?" He stated, "No."

And the telephone was right there, and I said, Mr. Reese, if you want an attorney, here's a telephone. Here's a phone book. We will call you one if you so desire, and he said, no, he didn't want an attorney. He didn't need one.

Q Did he tell you why he said he didn't need an attorney?

A He said, "I didn't do it and I don't need an attorney, and I don't want one."

Q Was there any other discussion about an attorney in your presence between Donald Reese and Jim Brown?

A Yes. Jim asked him if he had an attorney for his divorce that was representing him, that he could call him and talk to him, and he advised, no, he did not have one. He didn't need one for his divorce, and he didn't want to call any attorney.

Q Was there any discussion at that point about the pending preliminary hearing setting?

A Something was said about the preliminary hearing is coming up within two or three days. You will need an attorney for the preliminary hearing.

Q Who said that?

A I think Jim said it first.

Q Jim said this to Mr.—

A Mr. Reese.

Q The defendant?

A Said you will have to have an attorney for a preliminary hearing when you appear before a judge.

Q Now, this is after the defendant has been arraigned on charges of murder; is that correct?

A That is correct.

Q And it's my understanding that Jim Brown indicated in your presence to the defendant that he was going to have to have a lawyer for his preliminary hearing; is that correct?

A That's correct, and I reemphasized it, too.

Q What was the defendant's response when Jim Brown told him that he had to have a lawyer at his preliminary hearing?

A He said he didn't want a lawyer. He didn't need any and wasn't intending to have a lawyer at the preliminary.

Q Now, when was the preliminary, what day was this that you went in to see Mr. Reese, what day of the week?

A As I recall, it was a Tuesday that I was there.

Q And when was this preliminary hearing set?

A  Either a Thursday or Friday.

Q  So the following Thursday or Friday?

A  That's correct.

Q  Was there any other discussion after Mr. Reese said he didn't want an attorney for his preliminary hearing?

A  Jim Brown asked him if he had filled out a questionnaire for a public defender.

Q  Jim Brown asked him to do this?

A  Asked him if he had. He stated—

Q  At anytime during what has transpired so far did the defendant ever ask for a lawyer or ask to fill out any form for a lawyer?

A  No, sir, just the opposite.

Q  Who brought up the point about filling out the form for a lawyer?

A  Jim Brown did.

Q  Now, after the discussion about which you have testified what, if anything did Jim Brown do?

A  When he advised—Mr. Reese said, no, he had not filled out a form, Jim said it is a policy that a form has to be filed out in their jail for an attorney if—whether you want one or not, the questionnaire has to be filled out. Mr. Reese said he wasn't sure if he qualified or not. I think Jim said, well, it could be filled out because it can be torn up if you don't qualify but it has to be filled out.

Q  What was the purpose for filling out the form?

A  For public defender if he needed one at the time at preliminary hearing.

Q  Was there any discussion between Mr. Reese—between Mr. Reese and you or between Mr. Reese and Jim Brown in your presence where the defendant asserted that he wanted an attorney right now at that time of the interview?

A  No, sir, never.

Q  Other than the conversation with regard to the need for a lawyer on Thursday or Friday did the defendant say anything else about a lawyer?

A  No, sir. He never did ask for a lawyer, said he didn't want a lawyer.

When defendant was filling out the form, he was not particularly attentive to the questions and instructions. He checked that he was widowed even though he was not and he wrote in the names of his parents, which the form specifies only for juveniles. But for Deputy Brown, the form in question might still be on the shelf. Defendant was willing to deal on his own with the police at a time when he knew he could do otherwise. He chose, as was his right, to proceed with the interrogation that was occurring and the interrogation that would follow.

The public defender form was not directed to the officer and did not interject ambiguity into the clear unequivocal assertions of the defendant, some made only moments before the form was filled out. Even if we assume the form in question was a request for counsel, it is equally clear that such request was that an attorney be provided for him in the future, at his trial, or at the earliest, at the preliminary hearing, and not for the questioning which was taking place at that time. A number of state and federal decisions, including one from Missouri, address this situation. *State v. Thomas*, 698 S.W.2d 942, 947–48 (Mo.App.1985); *State v. Shifflett*, [199 Conn. 718], 508 A.2d 748, 757–59 (1986); *Bradburn v. McCotter*, 786 F.2d 627, 629–31 (5th Cir.1986); *United States v. Jardina*, 747 F.2d 945, 948–49 (5th Cir.1984). All of these cases involve instances in which an accused has indicated during questioning that he wishes to obtain or speak to an attorney, but through his words and the surrounding circumstances, he has made it clear that this request applies only to a future time and not to the questioning at hand. In *Thomas*, for example, the defendant was arrested in Indiana and was to be returned to Missouri on a murder charge. 698 S.W.2d at 944. While being questioned by Indiana police, he made reference to the fact that an attorney would be appointed for him when he got back to Missouri, and refused to answer certain questions by saying that he would "save that for when I get my lawyer." *Id.* at 947–48. The Missouri Court of Appeals found that this was not a present request for counsel, holding that "[a] reference to a future time when a lawyer will be available or appointed does

not negate an expressed willingness to presently talk to the police without the presence of a lawyer." *Id.* at 947. So it is here. If Reese's statement on the form is truly an indication that he wanted counsel, it must be construed in light of his repeated assertions, including some made only moments before the form was filled out, that he did not desire an attorney to be present at the time of questioning or even at the preliminary hearing. Being no stranger to the criminal justice system (Defendant's Exhibit "B"), he could rationally conclude that he would eventually need an attorney for his trial and for pretrial proceedings involving matters of law. However, the record is quite clear that defendant Reese did not feel a need for legal assistance during his questioning by the officers, and that he did not ask to deal with police only through counsel. Accordingly, no violation of *Edwards* is present here.

It appears that all the parties dealt with the public defender form as a housekeeping measure that concerned, at best, the prospective need for counsel. There was no present intent to deal with the police only through counsel. There is no evidence of any badgering or overreaching on the part of the police. If believed, North and Brown seemed solicitous on the issue of counsel. Both witnesses were credible. The "bright line" of *Edwards* never materialized and was never crossed.

Taking the prior and contemporaneous circumstances surrounding the execution of the form, this court concludes defendant neither asserted or invoked his right to counsel. *Smith v. Illinois*, 469 U.S. 91, [105 S.Ct. 490, 83 L.Ed.2d 488] (1984); *State v. Thomas*, 698 S.W.2d 942 (Mo.App. 1985); *State v. Shifflett*, [199 Conn. 718], 508 A.2d 748 (1986); *Bradburn v. McCotter*, 786 F.2d 627 (5th Cir.1986); *United States v. Jardina*, 747 F.2d 945 (5th Cir. 1984).

At his pre-arraignment fingerprinting and at the arraignment, defendant made statements that strongly suggest he was thinking about the need for counsel and

weighing that need in his own mind, but those statements do not rise to an assertion that he wanted a lawyer. They are indicative of intellectual functioning, reflection, and intelligent deliberation.

At the fingerprinting defendant asked if he should be doing "this", whereupon he was carefully given his *Miranda* rights. Officer LaPage was then asked by defendant if he thought that defendant needed an attorney. When LaPage told him that he could not advise him, Reese told LaPage to forget it.

No questioning took place at this time. This court holds as a matter of law that the statements made at the fingerprinting were not tantamount to an assertion by defendant that he wanted counsel.

At his arraignment defendant made an aside to the officers who had accompanied him, one of whom was Deputy Brown, that "I don't think I'd be able to afford a lawyer." This is not an assertion that he wanted counsel. If it can be considered an equivocal statement requiring inquiry, Officers Brown and North did just that when they read him his rights the next morning and asked him straight out if he wanted counsel. Reese said he did not. No interrogation took place after arraignment and prior to ascertaining defendant's intent.

The court, having found that defendant did not "invoke" his right to counsel, now considers whether defendant "waived" his right to counsel. As regards the interrogations it is clear that a defendant may waive his Sixth Amendment right just as he can his Fifth Amendment right. *Brewer v. Williams*, 430 U.S. 387 [97 S.Ct. 1232, 51 L.Ed.2d 424] (1977); *State v. Boggs*, 634 S.W.2d 447, 452–453 (Mo. banc 1982). Indeed, the standard for a voluntary waiver is the same under both constitutional provisions. The state must show "an intentional relinquishment or abandonment of a known right or privilege." *Brewer*, 430 U.S. at 404 [97 S.Ct. at 1242] (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, [58 S.Ct. 1019, 1023, 82 L.Ed. 1461] (1938)). Most jurisdictions, including Missouri, hold that a voluntary *Miranda* waiver, which includes the advisement that the accused is entitled to

an attorney, will suffice as a waiver of Sixth Amendment rights, although some courts require something in addition to this warning. *Boggs*, 634 S.W.2d at 452–53; *State v. Chandler*, 605 S.W.2d 100, 111–17 (Mo. banc 1980); *Riley v. State*, 501 So.2d 551, 554–57 (1986); *People v. Tackett*, [150 Ill.App.3d 406, 103 Ill.Dec. 574, 580–81], 501 N.E.2d 891, 897–98 (1986); *Tinsley v. Purvis*, 731 F.2d 791, 793–96 (11th Cir. 1984).

No matter what standard is applied, it was met in the case *sub judice*. The fact that defendant was repeatedly advised of and repeatedly waived his *Miranda* rights is merely the opening act in establishing his Sixth Amendment waiver. He refused more than one offer by law enforcement officials to telephone a lawyer, and explained why he did not want one. He said that he did not even want an attorney at the preliminary hearing. Reese had been present at his arraignment, and thus knew that charges had been filed against him and was aware of "the gravity of the situation." *People v. Tackett*, [103 Ill.Dec. at 581] 501 N.E.2d at 898. As noted previously, defendant was not the object of threats or coercive tactics by police. Finally, Reese was 43 years of age, had a high school equivalency education and was not unfamiliar with the criminal justice system, having previously been prosecuted for a felony (State's Exhibit 1, Defendant's Exhibit "B"). *See Riley v. State*, 501 So.2d at 556–57. Under all of these facts, Reese's repeated statements that he did not want an attorney manifestly constituted a voluntary waiver of his Sixth Amendment right to counsel. The waiver was made knowingly, voluntarily and intelligently.

On the subject of the Sixth Amendment, this court concludes that the state has sustained its burden and that the statement given to Sheriff Darnell was not taken in violation of defendant's Sixth and Fourteenth Amendment rights. Defendant's challenge in that regard is overruled.

### III. FIFTH AMENDMENT

Defendant claims that the inculpatory statement given to Sheriff Gene Darnell was obtained in violation of his Fifth and Fourteenth Amendment rights because he was denied the assistance of counsel at his post-arraignment interrogation.

The Fifth Amendment protection against self-incrimination provides an accused with the right to have counsel present during custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966). *Edwards v. Arizona*, 451 U.S. 477, [101 S.Ct. 1880, 68 L.Ed.2d 378] (1981), established a bright-line rule to safeguard this right by holding that an accused person in custody who has expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused initiates further communication, exchanges, or conversations with the police.

Because the same principles are applicable to determining a waiver of Fifth Amendment right to counsel as are applicable to determining a waiver of the Sixth Amendment right to counsel, *Michigan v. Jackson*, 475 U.S. 625 [106 S.Ct. 1404, 89 L.Ed.2d 631] (1986), the Court refers the parties to its conclusions in heading II above and finds the Fifth Amendment issue raised by defendant to be without merit. Defendant's motion to suppress is overruled as regards this subject.

### IV. VOLUNTARINESS OF CONFESSION

The court notes that defendant did not address the issue of whether the statement of defendant was voluntarily given. Waiver and voluntariness are distinct matters under the Fifth Amendment. For purposes of the Motion to Suppress, the court accepts the arguments of the State and finds for purposes of the motion only, that said statement was voluntarily given. In this regard the court concludes as follows:

As with the voluntariness of Reese's *Miranda* waiver, the only issue in determining the voluntariness of his confession for purposes of this motion to suppress is whether it was the product of "police overreaching." *Colorado v. Connelly*, 479

U.S. 157, 163–64 [107 S.Ct. 515, 519–20, 93 L.Ed.2d 473] (1986). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id.* at 167 [107 S.Ct. at 522]. Not only is no "coercive police activity" apparent from the present record, but it is clear that the law enforcement authorities displayed a painstaking regard for the defendant's rights from the time of his arrest to his confession. Immediately after his arrest, defendant was told that he should stay silent unless and until he was interrogated. He was fully advised of his *Miranda* rights when he asked about them, even though he was not being questioned at that time. He was never deprived of food, drink or toilet facilities. He was never threatened or abused by the officers. He was allowed to visit with his family. In short, the record is utterly devoid of any police conduct which would overbear the will of the defendant in making his statement to the police. *State v. Buckles*, 636 S.W.2d 914, 923 (Mo. banc 1982).

Any implication that the Sheriff somehow acted improperly when he allowed Reese's wife to visit him in the hope that this would induce a confession is not on the present record. She was no "secret police agent," as in *United States v. Henry*, 447 U.S. 264 [100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). Mrs. Reese visited her husband at her own request and to date she has not supplied the record with any incriminating statements made by the defendant in private conversations with her. *Cf. United States v. Henry*, 447 U.S. 264, 266–68 [100 S.Ct. 2183, 2184–86, 65 L.Ed.2d 115] (1980). Most important, the defense makes no effort to claim that Reese was unaware that his wife had spoken with Sheriff Darnell on this matter. Indeed, his own offer of proof alleges that Mrs. Reese told her husband that "Deputy Brown and Sheriff Darnell wanted her aid in attempting to get a confession from him." Thus, there is a complete absence of evidence at this time that subterfuge was employed to secure Reese's confession. *See State v. Evans*, 676

S.W.2d 324, 327 (Mo.App.1984), in which a confession was actually obtained by subterfuge, but was held to be voluntary. Viewing the totality of the circumstances, the defendant's confession was voluntarily given. The motion to suppress it is denied.

## V.  HEARSAY OBJECTION

As regards defendant's offer of proof that defendant made a statement to his wife concerning his intention not to give a statement until he had a lawyer, and the State's objections to said evidence on the grounds of relevancy and hearsay, the court sustains the hearsay objection and denies the offer of proof.

However, the court finds after due deliberation that even if the proffered evidence was received, it would not change the findings and conclusions the court has made in this order. In reaching this conclusion the court assumes the truth of the assertion and weighs it against all of the facts and circumstances in evidence as if it had been received.

## ORDER

Now on this ____ of July, 1987, it is Ordered, Adjudged and Decreed that defendant's Motion to Suppress his confession is overruled and denied.

SO ORDERED:

_____

JOHN LYON ANDERSON
Division Three
23rd Judicial Circuit
of Missouri (Jefferson County)